UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

**TANISHA BOWERS and BRYAN SCOTT KELLEMS,**
**parents of EK, Individually and as**
**Next Friends of EK, a minor,**

      Plaintiffs,

vs.

                                                    Case No. 22-cv-10792
                                                    Hon.

**UNITED STATES OF AMERICA,**
**DETROIT COMMUNITY HEALTH CONNECTION,**
**INC., a domestic nonprofit corporation,**
**LESLIE D. DANLEY, M.D.,**
**and DMC PRIMARY CARE PHYSICIANS, P.C.**

      Defendants.

---

JESSE M. REITER (P40692)
ANNE L. RANDALL (P36842)
JAMES R. MCCULLEN (P63022)
Attorneys for Plaintiff
Reiter & Walsh, P.C.
122 Concord Road
Bloomfield Hills, MI 48304
(248) 593-5100
jreiter@abclawcenters.com
arandall@abclawcenters.com
jmccullen@abclawcenters.com

**THERE IS NO OTHER PENDING OR RESOLVED CIVIL ACTION ARISING**
**OUT OF THE TRANSACTION OR OCCURRENCE ALLEGED IN THE**
**COMPLAINT.**

**JESSE M. REITER (P40692)**
**ANNE L. RANDALL (P36842)**
**JAMES R. MCCULLEN (P63022)**

REITER & WALSH, P.C.
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304
Office:   (248) 593-5100
Facsimile:   (248) 593-5108

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:     (248) 593-5100
Facsimile:  (248) 593-5108

## COMPLAINT

NOW COME the above-named Plaintiffs, **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS**, parents of **EK**, a minor, Individually, and **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS**, next friends of **EK**, a minor, and by and through their attorneys, Reiter & Walsh, P.C., and for their cause of action against **THE UNITED STATES OF AMERICA**, **DETROIT COMMUNITY HEALTH CONNECTION, INC., LESLIE D. DANLEY, M.D.**, and **DMC PRIMARY CARE PHYSICIANS, P.C.**, state as follows:

## JURISDICTIONAL ALLEGATIONS

1)      This action arises under the Federal Tort Claims Act 28 USC 1346 (b)(1), 2671 *et seq*., as hereinafter more fully appears.  Before this action was instituted, the claims set forth herein were presented to the United States Department of Health and Human Services, Office of the General Counsel, General Law Division Claims and Employment Law Branch, in a Notice dated June 3, 2021. The Department of Health and Human Services acknowledged receipt of the Notice in a letter dated July 29, 2021. The Department of Health and Human Services requested additional information in a letter on July 29, 2021, and such information was provided on August 5, 2021.

2)      The Department of Health and Human Services has not denied these claims; plaintiffs filed this lawsuit greater than six (6) months after the administrative presentation of their claims.

2

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:      (248) 593-5100
Facsimile:   (248) 593-5108

3)      This action concerns injuries sustained by **EK** from circumstances surrounding the prenatal care for **TANISHA BOWERS** that resulted in placental abruption and **EK**'s injuries on April 16, 2020.

4)      The Plaintiffs are currently residents of the City of Detroit, County of Wayne, State of Michigan.

5)      As more fully set forth below, Plaintiffs sustained personal injuries as a result of negligent acts or wrongful acts or omissions of the pertinent treating medical staff employed by **DETROIT COMMUNITY HEALTH CONNECTION, INC.**, a domestic nonprofit corporation and federally supported health center and FTCA covered entity pursuant to 42 CFR 6.2 and 42 CFR 6.3, located in Detroit, Michigan, including **LESLIE D. DANLEY, M.D**.

6)      **LESLIE D. DANLEY, M.D.**, is a Michigan-Licensed health care professional specializing in Obstetrics and Gynecology and practicing in the County of Wayne, State of Michigan and, as employee/agent of **DETROIT COMMUNITY HEALTH CONNECTION, INC.,** is a covered individual pursuant to 42 CFR 6.4, and is an employee/agent of **DMC PRIMARY CARE PHYSICIANS, P.C.**

7)      **DMC PRIMARY CARE PHYSICIANS, P.C.**, is a professional corporation and licensed health facility doing business in the County of Wayne, State of Michigan.

8)      At the time or times mentioned below, employees of **DEFENDANT DETROIT COMMUNITY HEALTH CONNECTION,** a covered entity, including **LESLIE D. DANLEY, M.D.**, and any physicians under her supervision, covered

3

individuals, committed negligent acts or wrongful acts or omissions, and said employees were acting within the scope of their employment.

9) At all times pertinent hereto, physicians, residents, and healthcare providers of the Defendant were duly authorized agents, servants and/or employees of **DETROIT COMMUNITY HEALTH CONNECTION, INC**., a covered entity, and were acting as such agents, servants and/or employees and within the scope of their authority and duties as such.

10) The Federal District Court for the Eastern District of Michigan, Southern Division, has federal-question jurisdiction because this action is brought pursuant to and in compliance with 28 USC 1346(b), 2671-2680, commonly known as the Federal Tort Claims Act.

11) Venue is proper in this District under 28 U.S.C. 1391(e) because the United States is the defendant and a substantial part of the events or omissions giving rise to the claims occurred in this District.

12) This Court has jurisdiction over claims alleged against **LESLIE D. DANLEY, M.D.**, **DETROIT COMMUNITY HEALTH CONNECTION, INC.**, and **DMC PRIMARY CARE PHYSICIANS, P.C.**, pursuant to 28 USC §1367(a) as claims supplemental to those brought pursuant to the Federal Tort Claims Act.

13) The **UNITED STATES OF AMERICA** may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summon and Complaint on the **United States Attorney Dawn N. Ison**, United States

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office: (248) 593-5100
Facsimile: (248) 593-5108

4

Attorney for the Eastern District of Michigan, by certified mail, return requested at her

office:

> **United State Attorney's Office**
> **ATTN: Civil Processing Clerk**
> **211 W. Fort St., Suite 2001**
> **Detroit, MI 48226**

14)     Service is also effected by serving a copy of the Summons and Complaint

on **Merrick B. Garland, Attorney General of the United States**, by certified mail, return

receipt requested at:

> **Attorney General of the United States**
> **ATTN: Civil Process Clerk**
> **950 Pennsylvania Avenue, NW**
> **Washington, DC 20530-0001**

15)     Service is effected on **LESLIE D. DANLEY, M.D.**, by serving a copy of

the Summons and Complaint in a manner permitted under Rule 4(e) of the Federal Rules

of Civil Procedure.

16)     Service is effected on **DMC PRIMARY CARE PHYSICIANS, P.C.**, by

serving a copy of the Summons and Complaint in a manner permitted under Rule 4(h) of

the Federal Rules of Civil Procedure.

17)     Service is effected on **DETROIT COMMUNITY HEALTH**

**CONNECTION, INC.,** by serving a copy of the Summons and Complaint in a manner

permitted under Rule 4(h) of the Federal Rules of Civil Procedure.

## GENERAL ALLEGATIONS

18)     Plaintiffs **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS**,

individually, and **TANISHA BOWERS and BRYAN SCOTT KELLEMS**, as Next

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:    (248) 593-5100
Facsimile:  (248) 593-5108

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:    (248) 593-5100
Facsimile: (248) 593-5108

Friends of **EK**, a minor, hereby reallege allegations contained in paragraphs 1 through 17 of this Complaint as if fully stated herein.

19)     Plaintiff **TANISHA BOWERS** was seen for prenatal care at **DETROIT COMMUNITY HEALTH CONNECTION, INC.,** a covered entity, starting on October 22, 2019; **DR. LESLIE D. DANLEY** reported **TANISHA**'s obstetrical history as G1P0, 30 years of age, baseline weight 146 lbs, 6 ounces.

20)     On October 24, 2019, lab analyses confirmed normal hemoglobin/hematocrit of 11.6/33.2% and positive marijuana.  Dipstick urinalysis showed trace protein/negative glucose/negative leukocytes.  Complete urinalysis was negative for protein, glucose, and leukocytes.  Sickle cell screen was positive.  Herpes Simplex 2 was positive.  Pregnancy by urine test was confirmed.  Blood pressure was 101/61, pulse 70.

21)     On October 28, 2019, a transabdominal ultrasound was performed which confirmed an intrauterine pregnancy of 13 1/7 weeks gestation.  EDC was noted as 5/03 and 5/30/20 (handwritten).  The handwritten note, however, appears incorrect as the EGA was 18 3/7 weeks by LMP.  Fetal heart rate and + movement were further noted.

22)     On December 16, 2019, **TANISHA** presented for prenatal care with **DR. DANLEY**.  According to **DR. DANLEY**, this was **TANISHA**'s first prenatal visit.  Last menstrual period was noted as 7/11/2019.  EDC based on LMP was 4/16/2020.  **DR. DANLEY** reported 22 4/7 weeks gestation at this time.  Despite prior report of gravida 1 status for **TANISHA**, on this occasion **DR. DANLEY** reported as follows:  "Patient had a vaginal preterm delivery at 32 weeks due to preeclampsia."  ßHCG reported as positive for pregnancy, though no lab result is contained in the chart.  Blood pressure was 110/68;

pulse was 78.  No further information regarding preeclampsia, high-risk status, or plan of care for a high-risk patient was provided in these records.

23)    According to **DR. DANLEY**'s charting, **TANISHA** returned for prenatal care on December 23, 2019, and a transvaginal ultrasound was performed for viability in the 2nd trimester.  LMP was reported as 6/21/2019 with an EDC of 3/27/2020.  The ultrasound showed an estimated fetal weight of 397g and an estimated gestational age of 21 weeks, giving an EDC of 5/4/2020.  The fetal anatomy appeared normal.  The report is signed by George Shade, MD.

24)    On January 6, 2020, **TANISHA**'s blood pressure was 102/64, pulse 71.  A urinalysis showed +1 protein, - glucose.

25)    On January 27, 2020, **TANISHA**'s blood pressure was 116/77, pulse 75.  Her LMP was again reported as 7/11/2019.  Her estimated date of delivery was reported as 4/16/2020.  She was again inaccurately designated a G1P0, though the record indicates that she had a previous vaginal delivery on 1/24/2008 of a 3lb male at Beaumont.  She was 28 4/7 weeks gestation.  A urinalysis showed a protein of +30.  A glucose screen was normal, 96mg/dl (<135).  There were no complaints reported.

26)    On February 10, 2020, **TANISHA**'s blood pressure was 114/68, pulse 52.  Her weight was 149lbs, 2lbs 10oz above her pre-pregnancy weight of 146lbs 6 oz.  She was 28 weeks according to **DR. DANLEY**'s record.  A urine dipstick showed +protein/-glucose.  A urinalysis showed +30 protein.  Fundal height was 30, consistent with dates.  Fetal heart tones were reported as 154.

REITER & WALSH, P.C.
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304
Office:     (248) 593-5100
Facsimile:  (248) 593-5108

27)     On March 2, 2020, **TANISHA**'s blood pressure was 127/80, pulse 70; (-) edema was reported.  Her weight was 154 lbs.  She was 31 weeks gestation with a fundal height of 31.  Fetal heart tones were 130.  A urinalysis reflected -protein/-glucose.

28)     On March 23, 2020, at 34 weeks gestation, **TANISHA** returned to **DR. DANLEY** for her appointment.  Her blood pressure was 115/80; pulse 75.  Her weight was 153 lbs 12.8oz.  +fetal movement and heart tones in the 140s were reported.  Fundal height was 34, consistent with dates. –edema was reported.  Urinalysis showed +.15 protein/(-) glucose/+0.5 ketones/15 leukocyte esterase.

29)     On March 30, 2020, at 35 weeks gestation, a significant rise in blood pressure was apparent.  Her blood pressure (sitting) was reported as 142/95; pulse 62, consistent with hypertension.  There were no additional blood pressure readings taken at this time.  Her weight was 157, a significant increase from the previous week.  Fundal height was 37.  -edema was reported.  Urinalysis showed -protein/-glucose/+1.5 ketones/+70 leukocyte esterase.  Fetal heart tones were recorded at 138 with positive movement.  EDD was noted as 5/4/2020.  This note was signed by **DR. DANLEY** on 4/19/2020.

30)     On April 13, 2020, **TANISHA** returned to **DR. DANLEY** for her prenatal care visit.  Her blood pressure was now 157/91 (sitting), again consistent with hypertension.  No additional blood pressure readings were recorded.  Her weight was 157lbs at 37 weeks gestation with a fundal height of 37.  Positive fetal movement was noted with heart tones of 130.  -edema was reported.  Urinalysis showed +0.3 protein/-glucose/+0.3 bilirubin/+1.5 ketones.  **DR. DANLEY**'s plan of care was as follows:

REITER & WALSH, P.C.
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:    (248) 593-5100
Facsimile:  (248) 593-5108

**PLAN**
- **Encounter for suprvsn of normal pregnancy, third trimester**
  Lab: SURESWAB(R), VAGINOSIS/VAGINITIS PLUS
  Lab: STREPTOCOCCUS, GROUP B CULTURE
  Lab: CBC (INCLUDES DIFF/PLT)
  Lab: HIV 1/2 ANTIGEN/ANTIBODY,FOURTH GENERATION W/RFL

31)     There is no evidence that this plan was carried out despite urinalysis results and confirmed gestational hypertension, or pregnancy induced hypertension (PIH), that required further investigation, surveillance, and treatment of **TANISHA** and her baby. **DR. DANLEY** amended this note on 5/1/2020.

32)     On April 16, 2020, at approximately 01:30, **TANISHA**, now 37 3/7 weeks gestation, presented to St. John Hospital and Medical Center emergently with complaints of contractions.  She told her providers that her blood pressures had been higher the last few prenatal visits.  She indicated of her obstetrical history a previous preterm vaginal delivery at 35 weeks.  In triage care providers noted inconsistent graphing of the fetal heart tones in the 60s.  A bedside ultrasound confirmed fetal heart tones in the 60s-70s.  The decision was made to proceed with an emergent cesarian section at 01:42, and Chad White, M.D., delivered Baby **EK** at 01:58 with Apgars of 0/1/2/2.  An estimated 500cc was lost due to surgery and 500cc additionally due to placental abruption according to Dr. White.  Dr. White diagnosed near complete placental abruption with a 500cc retroplacental clot.  Urinalysis performed at 05:59 revealed >500 protein and 150 glucose.  **TANISHA** required multiple transfusions of blood products due to abruption.  Placenta pathology revealed a 330g placenta, consistent with intrauterine fetal growth restriction (IUGR), and 115g aggregate of dark red fresh blot clot.  **EK**'s birth weight was 2090g (0%tile by

Fenton) and head circumference 31.5cm (31st%tile by Fenton). He was described as dusky, pale, and apneic. Baby **EK** was aggressively resuscitated and intubated and placed on mechanical ventilation. A heart rate of >60bpm was attained at ≈6min of life and chest compressions discontinued. Baby **EK** remained limp, pale, apneic, and unresponsive. Arterial cord gases were as follows: pH 6.47; base excess -33.2. A near-complete placental abruption and a 500cc retroplacental clot were noted as the inciting causes. Hypothermia protocol was initiated. On April 15, an EEG was performed which demonstrated seizure activity and was read as abnormal. Phenobarbital and Keppra were administered. Diagnoses included convulsions, neonatal seizures, and severe hypoxic ischemic encephalopathy.

33) Post-partum records for **TANISHA** contained laboratory analyses of April 16 at 20:20 which showed: RBC 1.75; HGB 5.6; HCT 17.8; PLT 119, consistent with blood loss and placental abruption. TANISHA received numerous transfusions of blood products on April 16, 17, and 18.

34) A Pediatrics Progress Note authored by Elizabeth Boltik, DO (PGY3) on April 19, 2020 (signed by Athina Pappas, MD (neonatology)), included the following diagnoses for **EK**: severe neonatal encephalopathy with multi-organ failure, newborn affected by placental abruption, seizures s/p status epilepticus, respiratory failure, pulmonary hemorrhage, severe fetal and neonatal acidosis, coagulopathy, disseminated intravascular coagulation of the newborn, pulmonary hypertension of the newborn, patent ductus arteriosus (PDA), patent foremen ovale (PFO), newborn affected by maternal pre-eclampsia, IUGR/SGA, and concern for sepsis.

REITER & WALSH, P.C.
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304
Office:      (248) 593-5100
Facsimile:   (248) 593-5108

10

35)    **EK**'s initial lab analyses demonstrated findings consistent with hypoxia caused by placental abruption including the following on April 16 and 17.  **EK** was transfused with blood products numerous times during the neonatal period as a direct result of the placental abruption.

36)    On May 21, 2020, MR imaging demonstrated severe hypoxic ischemic encephalopathy with stable diffuse multicystic encephalomalacia of cerebral hemispheres bilaterally consistent with sequelae of diffuse hypoxia and stable cerebral atrophy, venous sinus thrombosis, and small subdural hematoma along right temporal lobe.

37)    On May 23, 2020, an MRI with contrast was performed, demonstrating right transverse sinus thrombosis and other findings consistent with 5/21 study.

38)    Baby **EK** remained intubated until May 4, 2020, and was on room air by May 10.  Blood and sputum cultures were consistently negative.  A limited septic workup was negative.  Maternal Covid evaluation was negative.

39)    **EK** was later diagnosed with spastic quadriplegic cerebral palsy.  He is significantly developmentally delayed.    **EK** will require 24-hour medical care and treatment and 24-hour assistance for the rest of his life.

### COUNT I – PROFESSIONAL NEGLIGENCE OF
### DETROIT COMMUNITY HEALTH CONNECTION, INC.,
### A COVERED ENTITY

40)    Plaintiffs **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS**, individually, and **TANISHA BOWERS and BRYAN SCOTT KELLEMS**, as next friends of **EK**, a Minor, hereby restate allegations contained in paragraphs 1 through 39 of this Complaint, as if fully stated herein.

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:      (248) 593-5100
Facsimile:   (248) 593-5108

41)    The standards of practice or care required that the Defendant, **DETROIT COMMUNITY HEALTH CONNECTION, INC.,** a covered entity, do all of the following:

a) Select, employ, train and monitor its employees, servants, agents, ostensible agents and/or its staff of physicians, nurses and nurse practitioners to ensure they were adequately trained, competent and qualified to perform optimum medical care to mothers and their babies.

b) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

c) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

d) Comply with Joint Commission Standards regarding credentialing and recredentialing of physicians by performing all of the following in an ongoing manner:

   i.    Confirming current licensure and any disciplinary actions against the physician's license through a primary source;

   ii.   Obtaining and documenting information from the National Practitioner Databank (NPDB);

   iii.  Determining and documenting that physician is currently privileged at a Joint Commission-accredited organization;

   iv.   Reviewing the physician's clinical performance;

   v.    Reviewing the performance improvement activities of the physician pertaining to professional performance, judgment, and clinical or technical skills;

   vi.   Confirming the physician's adherence to organization policies, procedures, rules, and regulations;

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304
Office:     (248) 593-5100
Facsimile:  (248) 593-5108

12

vii.    Providing a list to the physician of any limitations on the care, treatment, and services he or she can provide;

viii.    Confirming the physician is currently licensed, certified, and/or registered as required by law and regulation;

ix.    Investigate a physician's practice and licensure to ensure proper credentialing and re-credentialing before and after granting hospital privileges for quality of care;

e)  Create, implement, and enforce protocols, policies, and procedures for care and treatment of the maternal and fetal patients during the prenatal period in compliance with Joint Commission Standards and Guidelines.

f)  Truthfully and accurately document the patients' medical records;

g)  Retain a full and complete legible copy of the medical records, and maintain and provide appropriate and adequate documentation including but not limited to audit trials, audit logs, and revision histories;

h)  Create, implement, and enforce policies, protocols, and procedures intended to maximize patient safety including but not limited to the following:

i.    Diagnosis of gestational hypertension/pregnancy induced hypertension (PIH);

ii.    Recognition and diagnosis of preeclampsia;

iii.    Manage with aspirin in light of history of preeclampsia;

iv.    Delivery by 37 weeks in light of pregnancy induced hypertension (PIH)/gestational hypertension;

v.    Monitoring of the fetal/placental condition in a patient at high-risk for preeclampsia and/or PIH/gestational hypertension;

vi.    Treatment for pregnancy induced hypertension (PIH)/gestational hypertension/preeclampsia;

vii.    Maintenance/preservation of a patient's medical chart.

i)  Any other violations of the standards of practice or care that will be revealed during discovery.

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:   (248) 593-5100
Facsimile:  (248) 593-5108

42)    **DETROIT COMMUNITY HEALTH CONNECTION**, a covered entity, breached the standards of practice or care; therefore, it was professionally negligent.

43)    As a direct and proximate result of the negligence of **DETROIT COMMUNITY HEALTH CONNECTION**, a covered entity, Plaintiffs' minor **EK** was caused to suffer hypoxia, ischemia, and asphyxia arising before delivery and continuing after birth, and who now suffers global developmental delays, brain damage, hypoxic ischemic encephalopathy, spastic quadriplegic cerebral palsy, spasticity, dystonia, hypertonia, intracranial hemorrhage, gastrostomy tube feeding, gastroesophageal reflux disease, severe cognitive impairments, severe physical impairments, and microcephaly.

44)    Plaintiff **EK** has and will continue to suffer damages including but not limited to: lost earnings; earnings capacity; past and future medical care and treatment and expenses associated with same; need for assistance with tasks of daily living and expenses associated with same; and any and all economic and non-economic damages permitted under Michigan and federal law.

<u>**COUNT II – PROFESSIONAL NEGLIGENCE OF
DMC PRIMARY CARE PHYSICIANS, P.C.**</u>

45)    Plaintiffs **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS**, individually, and **TANISHA BOWERS and BRYAN SCOTT KELLEMS,** as Next Friends of **EK**, a Minor, hereby restate allegations contained in paragraphs 1 through 44 of this Complaint, as if fully stated herein.

46)    The standards of practice or care required that the Defendant, **DMC PRIMARY CARE PHYSICIANS, P.C.,** do all of the following:

14

a) Select, employ, train and monitor its employees, servants, agents, ostensible agents and/or its staff of physicians, nurses and nurse practitioners to ensure they were adequately trained, competent and qualified to perform optimum medical care to mothers and their babies.

b) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

c) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

d) Comply with Joint Commission Standards regarding credentialing and recredentialing of physicians by performing all of the following in an ongoing manner:

    i. Confirming current licensure and any disciplinary actions against the physician's license through a primary source;

    ii. Obtaining and documenting information from the National Practitioner Databank (NPDB);

    iii. Determining and documenting that physician is currently privileged at a Joint Commission-accredited organization;

    iv. Reviewing the physician's clinical performance;

    v. Reviewing the performance improvement activities of the physician pertaining to professional performance, judgment, and clinical or technical skills;

    vi. Confirming the physician's adherence to organization policies, procedures, rules, and regulations;

    vii. Providing a list to the physician of any limitations on the care, treatment, and services he or she can provide;

    viii. Confirming the physician is currently licensed, certified, and/or registered as required by law and regulation;

REITER & WALSH, P.C.
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:      (248) 593-5100
Facsimile:  (248) 593-5108

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:   (248) 593-5100
Facsimile:   (248) 593-5108

      ix.   Investigate a physician's practice and licensure to ensure proper credentialing and re-credentialing before and after granting hospital privileges for quality of care;

e) Create, implement, and enforce protocols, policies, and procedures for care and treatment of the maternal and fetal patients during the prenatal period in compliance with Joint Commission Standards and Guidelines.

f) Truthfully and accurately document the patients' medical records;

g) Retain a full and complete legible copy of the medical records, and maintain and provide appropriate and adequate documentation including but not limited to audit trials, audit logs, and revision histories;

h) Create, implement, and enforce policies, protocols, and procedures intended to maximize patient safety including but not limited to the following:

    i.   Diagnosis of gestational hypertension/pregnancy induced hypertension (PIH);

    ii.   Recognition and diagnosis of preeclampsia;

    iii.   Manage with aspirin in light of history of preeclampsia;

    iv.   Delivery by 37 weeks in light of pregnancy induced hypertension (PIH)/gestational hypertension;

    v.   Monitoring of the fetal/placental condition in a patient at high-risk for preeclampsia and/or PIH/gestational hypertension;

    vi.   Treatment for pregnancy induced hypertension (PIH)/gestational hypertension/preeclampsia;

    vii.   Maintenance/preservation of a patient's medical chart.

i. Any other violations of the standards of practice or care that will be revealed during discovery.

46)    **DMC PRIMARY CARE PHYSICIANS, P.C.**, breached the standards of practice or care; therefore, it was professionally negligent.

16

47)     As a direct and proximate result of the negligence of **DMC PRIMARY CARE PHYSICIANS, P.C.**, plaintiffs' minor **EK** was caused to suffer hypoxia, ischemia, asphyxia, arising before delivery and continuing after birth, and who now suffers global developmental delays, brain damage, hypoxic ischemic encephalopathy, spastic quadriplegic cerebral palsy, spasticity, dystonia, hypertonia, intracranial hemorrhage, gastrostomy tube feeding, gastroesophageal reflux disease, severe cognitive impairments, severe physical impairments, and microcephaly.

48)     Plaintiffs' minor **EK** has and will continue to suffer damages including but not limited to: lost earnings; earnings capacity; past and future medical care and treatment and expenses associated with same; assistance with tasks of daily living and expenses associated with same; and any and all economic and non-economic damages permitted under Michigan and federal law.

### COUNT III – PROFESSIONAL NEGLIGENCE OF LESLIE D. DANLEY, M.D., EMPLOYEE AND AGENT OF DETROIT COMMUNITY HEALTH CONNECTION, INC., A COVERED ENTITY, AND DMC PRIMARY CARE PHYSICIANS, P.C.

49)     Plaintiffs **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS**, individually, and **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS,** as Next Friends of **EK**, a Minor, hereby restate allegations contained in paragraphs 1 through 48 of this Complaint, as if fully stated herein.

50)     The standards of practice or care required that the Defendant **LESLIE D. DANLEY, M.D.**, and any physicians under her supervision do all of the following:

    a.  Perform a complete history and physical upon the patient's presentation;

    b.  Assess vital signs;

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:      (248) 593-5100
Facsimile:  (248) 593-5108

c.  Carefully evaluate the condition of the maternal and fetal patients upon presentation;

d.  Evaluate the wellbeing of the unborn fetus through monitoring of the fetal heart rate and pattern and maternal contractions;

e.  Perform appropriate blood and other laboratory testing in a patient demonstrating elevated and/or hypertensive blood pressures in the 3rd trimester of pregnancy;

f.  Perform 24-hour urine testing in a patient demonstrating elevated and/or hypertensive blood pressures in the 3rd trimester of pregnancy;

g.  Perform 24-hour urine testing in a patient demonstrating abnormalities on dip stick urine testing and urinalysis;

h.  Initiate screening and baseline testing/evaluation/treatment in a patient with an obstetrical history that includes preeclampsia;

i.  Recognize a patient at high-risk for gestational hypertension/pregnancy induced hypertension (PIH) and/or pre-eclampsia;

j.  Recognize the signs and symptoms of gestational hypertension/pregnancy induced hypertension (PIH);

k.  Recognize the early signs of preeclampsia;

l.  Recognize the signs and symptoms of preeclampsia;

m. Diagnose gestational hypertension/pregnancy induced hypertension (PIH);

n.  Diagnose preeclampsia;

o.  Treat the maternal patient for gestational hypertension/PIH/preeclampsia;

p.  Initiate antenatal surveillance including periodic ultrasound evaluation for fetal growth, umbilical blood flow/cerebral blood flow in the fetus, amniotic fluid level, fetal breathing, fetal tone, and fetal movement;

q.  Early serial testing and evaluation/re-evaluation in a patient at high-risk for preeclampsia and/or gestational hypertension/pregnancy induced hypertension (PIH);

r.  Initiate antenatal surveillance including non-stress/contraction stress testing and biophysical profiling;

s.  Initiate periodic fetoplacental assessment that includes umbilical artery doppler velocimetry;

t.  Recognize and diagnose intrauterine growth restriction (IUGR) in the fetus;

u.  Recognize a patient at risk for placental abruption;

REITER & WALSH, P.C.
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:      (248) 593-5100
Facsimile:  (248) 593-5108

18

REITER & WALSH, P.C.
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304
Office:     (248) 593-5100
Facsimile:  (248) 593-5108

v.   Recognize and diagnose proteinuria;

w.  Consult with high-risk obstetrics specialist/maternal fetal medicine for ongoing prenatal care and delivery plan;

x.   Consider treating with steroids for fetal lung maturity;

y.   Plan and prepare for induction or cesarean section delivery;

z.   Plan and prepare for induction of labor and vaginal delivery;

aa.  Plan for delivery at a facility with adequate maternal and neonatal intensive care resources;

bb.  Timely deliver;

cc.  Timely deliver by 37 weeks gestation;

dd.  Monitor and interpret the fetal heart rate and pattern and respond appropriately;

ee.  Supervise subordinate providers and clinicians including but not limited to resident physicians and nursing staff;

ff.  Comply with Joint Commission standards;

gg.  Any other violations of the standard of practice or care revealed during discovery.

**It will be alleged that DETROIT COMMUNITY HEALTH CONNECTION, INC., a covered entity, and DMC PRIMARY CARE PHYSICIANS, P.C., remain vicariously liable for any act or omission of any of their agents, actual or ostensible, and employees, including but not limited to LESLIE D. DANLEY, M.D., and any physicians under her supervision.**

51)   **LESLIE D. DANLEY, M.D.,** breached the standards of practice or care; therefore, she was professionally negligent.

52)   As a direct and proximate result of the negligence of **LESLIE D. DANLEY, M.D.,** Plaintiffs' minor **EK** was caused to suffer hypoxia, ischemia, asphyxia, arising before delivery and continuing after birth, and who now suffers global developmental delays, brain damage, hypoxic ischemic encephalopathy, spastic quadriplegic cerebral palsy, spasticity, dystonia, hypertonia, intracranial hemorrhage,

19

gastrostomy tube feeding, gastroesophageal reflux disease, severe cognitive impairments, severe physical impairments, and microcephaly.

## COUNT IIII
## PARENTAL CLAIMS

53) Plaintiffs **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS**, individually, and **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS,** as Next Friends of **EK**, a Minor, hereby restate allegations contained in paragraphs 1 through 52 of this Complaint, as if fully stated herein.

54) **TANISHA BOWERS**, individually, has and will suffer due to the negligence of the Defendants. Specifically, **TANISHA BOWERS** has in the past and will in the future sustain the loss of companionship, services and society of her son.  She has been required in the past and will be required in the future to render extraordinary services, nursing and attendant and custodial care for her son.  She has in the past and will in the future incur extraordinary hospital, medical, supportive and related expenses for the care needed by her son.  She has in the past and will in the future incur extraordinary out of pocket expenses related to the care needed by her son. As a result, **TANISHA BOWERS** is entitled to such sums as necessary to compensate her for the injuries and damages which she has sustained.

55) **BRYAN SCOTT KELLEMS**, individually, has and will suffer due to the negligence of the Defendants. Specifically, **BRYAN SCOTT KELLEMS** has in the past and will in the future sustain the loss of companionship, services and society of his son. He has been required in the past and will be required in the future to render extraordinary services, nursing and attendant and custodial care for his son.  He has in the past and will

in the future incur extraordinary hospital, medical, supportive and related expenses for the care needed by his son, as well as a loss in earnings.  He has in the past and will in the future incur extraordinary out of pocket expenses related to the care needed by his son. As a result, **BRYAN SCOTT KELLEMS** is entitled to such sums as necessary to compensate him for the injuries and damages which he has sustained.

## CAUSATION AND DAMAGES

56)     Plaintiffs **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS**, individually, and **TANISHA BOWERS and BRYAN SCOTT KELLEMS,** as Next Friends of **EK**, a Minor, hereby restate allegations contained in paragraphs 1 through 55 of this Complaint, as if fully stated herein.

57)     That the joint and several negligence of the Defendants and their agents, servants, and employees created a foreseeable risk of injury to Plaintiffs' minor **EK**.

58)     That, but for the joint and several negligence of the defendants and their agents, servants, and employees the injuries suffered by **EK** would have been prevented.

59)     That Plaintiffs' minor **EK**'s catastrophic and permanent injuries will require life-long medical treatment and 24-hour, 7 day per week attendant care and will further prevent him from achieving employment in the competitive market; moreover, **EK** will suffer significant other damages attendant to his condition for which he seeks compensation.

60)     That Plaintiffs' minor **EK** has suffered grievous injuries and damages, including but not limited to the following:

    a.  Pain and suffering;
    b.  Disfigurement and deformity;

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:      (248) 593-5100
Facsimile:  (248) 593-5108

21

REITER & WALSH, P.C.
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:        (248) 593-5100
Facsimile:    (248) 593-5108

   c.  Mental and emotional injuries;

   d.  Medical expenses, past and future;

   e.  Developmental delay;

   f.  Hypoxic ischemic encephalopathy (HIE);

   g.  Permanent brain damage;

   h.  Permanent neurologic injury;

   i.  Cerebral palsy;

   j.  Swallowing and feeding deficits requiring a gastrostomy tube (G-tube);

   k.  Gastroesophageal reflux disease (GERD);

   l.  Global developmental delay;

   m. Seizure disorder;

   n.  Nutritional deficiency;

   o.  Need for occupational, physical, and speech therapies;

   p.  Need for extensive, extraordinary, lifetime medical care and services;

   q.  Need for lifetime 24-hour skilled nursing, nursing, home health and home care;

   r.  Need for medical devices;

   s.  Need for multiple medications;

   t.  Emotional, mental, and psychological distress;

   u.  Past, present, and future lifetime extraordinary medical expenses;

   v.  Loss of earnings;

   w. Loss of capacity to earn;

   x.  Loss of employability;

   y.  Costs and expenses for life-long attendant care;

   z.  Costs and expenses for extraordinary care;

   aa. All other damages permitted by law.

61)    Plaintiffs, individually and on behalf of EK, plead for all other damages, pecuniary or otherwise, arising out of law or equity, to which they may be justly and equitably entitled.

22

**WHEREFORE**, Plaintiffs **TANISHA BOWERS and BRYAN SCOTT KELLEMS,** individually, and **TANISHA BOWERS** and **BRYAN SCOTT KELLEMS,** as next friends of minor **EK**, pray for judgment against the defendants in whatever amount they are found to be entitled, together with interest, costs, and attorney fees.

Respectfully submitted,

**REITER & WALSH, P.C.**

**DATED:** April 13, 2022

*/s/ Jesse M. Reiter_____*
JESSE M. REITER (P40692)
jessereiter@abclawcenters.com
ANNE L. RANDALL (P36842)
annerandall@abclawcenters.com
JAMES R. MCCULLEN (P63022)
jamesmccullen@abclawcenters.com
Attorneys for Plaintiffs
122 Concord Road
Bloomfield Hills, MI 48304
(248) 593-5100

**REITER & WALSH, P.C.**
PROFESSIONAL CORPORATION
122 Concord, Bloomfield Hills, MI 48304

Office:      (248) 593-5100
Facsimile:  (248) 593-5108

23

**T. BOWERS**

## AFFIDAVIT OF MERITORIOUS CLAIM

STATE OF OHIO                          )
                                       )SS
COUNTY OF FRANKLIN          )

Andrew B. Bokor, M.D., being first duly sworn, deposes and says:

1) I am a Medical Doctor board certified in the field of Obstetrics and Gynecology.

2) I have reviewed Plaintiffs' NOTICE OF INTENT TO FILE CLAIM, and all medical records supplied to me by Plaintiffs' attorney concerning the allegations contained in the NOTICE OF INTENT TO FILE CLAIM.

3) During the year immediately preceding the date of the occurrence that is the basis for the plaintiffs' claims, I devoted a majority of my professional time to the practice of obstetrics and gynecology.

4) That the applicable standard of practice or care for Leslie D. Danley, M.D. and any physicians under her supervision was that of a physician board-certified and practicing in the specialty of obstetrics & gynecology.  When treating patients Tanisha Bowers and her unborn baby Elijah Kellems, the applicable standard of practice or care required that Dr. Danley and any physicians under her supervision timely and appropriately perform all of the following:

a) Perform a complete history and physical upon the patient's presentation;

b) Assess vital signs;

c) Carefully evaluate the condition of the maternal and fetal patients upon presentation;

d) Evaluate the wellbeing of the unborn fetus through monitoring of the fetal heart rate and pattern and maternal contractions;

e) Perform appropriate blood and other laboratory testing in a patient demonstrating elevated and/or hypertensive blood pressures in the 3rd trimester of pregnancy;

f) Perform 24-hour urine testing in a patient demonstrating elevated and/or hypertensive blood pressures in the 3rd trimester of pregnancy;

g) Perform 24-hour urine testing in a patient demonstrating abnormalities on dip stick urine testing and urinalysis;

h) Initiate screening and baseline testing/evaluation/treatment in a patient with an obstetrical history that includes preeclampsia;

i) Recognize a patient at high-risk for gestational hypertension/pregnancy induced hypertension (PIH) and/or pre-eclampsia;

j) Recognize the signs and symptoms of gestational hypertension/pregnancy induced hypertension (PIH);

k) Recognize the early signs of preeclampsia;

l) Recognize the signs and symptoms of preeclampsia;

m) Diagnose gestational hypertension/pregnancy induced hypertension (PIH);

n) Diagnose preeclampsia;

o) Treat the maternal patient for gestational hypertension/PIH/preeclampsia;

p) Initiate antenatal surveillance including periodic ultrasound evaluation for fetal growth, umbilical blood flow/cerebral blood flow in the fetus, amniotic fluid level, fetal breathing, fetal tone, and fetal movement;

q) Early serial testing and evaluation/re-evaluation in a patient at high-risk for preeclampsia and/or gestational hypertension/pregnancy induced hypertension (PIH);

r) Initiate antenatal surveillance including non-stress/contraction stress testing and biophysical profiling;

s) Initiate periodic fetoplacental assessment that includes umbilical artery doppler velocimetry;

t) Recognize and diagnose intrauterine growth restriction (IUGR) in the fetus;

u) Recognize a patient at risk for placental abruption;

v) Recognize and diagnose proteinuria;

w) Consult with high-risk obstetrics specialist/maternal fetal medicine for ongoing prenatal care and delivery plan;

x) Consider treating with steroids for fetal lung maturity;

y) Plan and prepare for induction or cesarean section delivery;

z) Plan and prepare for induction of labor and vaginal delivery;

aa) Plan for delivery at a facility with adequate maternal and neonatal intensive care resources;

bb) Timely deliver;

cc) Timely deliver by 37 weeks gestation;

dd) Monitor and interpret the fetal heart rate and pattern and respond appropriately;

ee) Supervise subordinate providers and clinicians including but not limited to resident physicians and nursing staff;

ff) Comply with Joint Commission standards;

gg) Any other violations of the standard of practice or care revealed during discovery.

5) That the applicable standard of practice or care relevant to Detroit Community Health Connection, Inc., is that of a reasonable and prudent health facility, directly and by and through its physicians. When treating Tanisha Bowers and her unborn baby Elijah Kellems, the standard of practice or care required Detroit Community Health Connection to provide and offer care and treatment with the skill and care ordinarily possessed and exercised by health facilities within the same or similar localities by timely and appropriately doing all of the following:

a) Select, employ, train and monitor its employees, servants, agents, ostensible agents and/or its staff of physicians, nurses and nurse practitioners to ensure they were adequately trained, competent and qualified to perform optimum medical care to mothers and their babies.

b) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

c) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

d) Comply with Joint Commission Standards regarding credentialing and recredentialing of physicians by performing all of the following in an ongoing manner:

i. Confirming current licensure and any disciplinary actions against the physician's license through a primary source;

ii. Obtaining and documenting information from the National Practitioner Databank (NPDB);

iii. Determining and documenting that physician is currently privileged at a Joint Commission-accredited organization;

iv. Reviewing the physician's clinical performance;

v. Reviewing the performance improvement activities of the physician pertaining to professional performance, judgment, and clinical or technical skills;

vi. Confirming the physician's adherence to organization policies, procedures, rules, and regulations;

vii. Providing a list to the physician of any limitations on the care, treatment, and services he or she can provide;

viii. Confirming the physician is currently licensed, certified, and/or registered as required by law and regulation;

ix. Investigate a physician's practice and licensure to ensure proper credentialing and re-credentialing before and after granting hospital privileges for quality of care;

e) Create, implement, and enforce protocols, policies, and procedures for care and treatment of the maternal and fetal patients during the prenatal period in compliance with Joint Commission Standards and Guidelines;

f) Truthfully and accurately document the patients' medical records;

g) Retain a full and complete legible copy of the medical records, and maintain and provide appropriate and adequate documentation including but not limited to audit trials, audit logs, and revision histories;

h) Create, implement, and enforce policies, protocols, and procedures intended to maximize patient safety including but not limited to the following:

i. Diagnosis of gestational hypertension/pregnancy induced hypertension (PIH);

ii. Recognition and diagnosis of preeclampsia;

iii. Manage with aspirin in light of history of preeclampsia;

iv. Delivery by 37 weeks in light of pregnancy induced hypertension (PIH)/gestational hypertension;

     v.    Monitoring of the fetal/placental condition in a patient at high-risk for preeclampsia and/or PIH/gestational hypertension;

     vi.    Treatment for pregnancy induced hypertension (PIH)/gestational hypertension/preeclampsia;

     vii.    Maintenance/preservation of a patient's medical chart.

i)   Any other violations of the standards of practice or care that will be revealed during discovery.

6)   That the applicable standard of practice or care relevant to DMC Primary Care Physicians, PC, is that of a reasonable and prudent health facility, directly and by and through its physicians.  When treating Tanisha Bowers and her unborn baby Elijah Kellems, the standard of practice or care required DMC Primary Care Physicians, PC, to provide and offer care and treatment with the skill and care ordinarily possessed and exercised by health facilities within the same or similar localities by timely and appropriately doing all of the following:

a)   Select, employ, train and monitor its employees, servants, agents, ostensible agents and/or its staff of physicians, nurses and nurse practitioners to ensure they were adequately trained, competent and qualified to perform optimum medical care to mothers and their babies.

b)   Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

c)   Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

d)   Comply with Joint Commission Standards regarding credentialing and recredentialing of physicians by performing all of the following in an ongoing manner:

   i.   Confirming current licensure and any disciplinary actions against the physician's license through a primary source;

   ii.   Obtaining and documenting information from the National Practitioner Databank (NPDB);

iii.  Determining and documenting that physician is currently privileged at a Joint Commission-accredited organization;

iv.  Reviewing the physician's clinical performance;

v.  Reviewing the performance improvement activities of the physician pertaining to professional performance, judgment, and clinical or technical skills;

vi.  Confirming the physician's adherence to organization policies, procedures, rules, and regulations;

vii.  Providing a list to the physician of any limitations on the care, treatment, and services he or she can provide;

viii.  Confirming the physician is currently licensed, certified, and/or registered as required by law and regulation;

ix.  Investigate a physician's practice and licensure to ensure proper credentialing and re-credentialing before and after granting hospital privileges for quality of care;

e)  Create, implement, and enforce protocols, policies, and procedures for care and treatment of the maternal and fetal patients during the prenatal period in compliance with Joint Commission Standards and Guidelines;

f)  Truthfully and accurately document the patients' medical records;

g)  Retain a full and complete legible copy of the medical records, and maintain and provide appropriate and adequate documentation including but not limited to audit trials, audit logs, and revision histories;

h)  Create, implement, and enforce policies, protocols, and procedures intended to maximize patient safety including but not limited to the following:

i.  Diagnosis of gestational hypertension/pregnancy induced hypertension (PIH);

ii.  Recognition and diagnosis of preeclampsia;

iii.  Manage with aspirin in light of history of preeclampsia;

iv.  Delivery by 37 weeks in light of pregnancy induced hypertension (PIH)/gestational hypertension;

v.  Monitoring of the fetal/placental condition in a patient at high-risk for preeclampsia and/or PIH/gestational hypertension;

vi.  Treatment for pregnancy induced hypertension (PIH)/gestational hypertension/preeclampsia;

vii.  Maintenance/preservation of a patient's medical chart.

     i.   Any other violations of the standards of practice or care that will be revealed during discovery.

_____

7) That in my opinion Leslie D. Danley, MD, and any physicians under her supervision breached the applicable standard of practice or care when they did not timely and appropriately perform all of the following:

    a)  Perform a complete history and physical upon the patient's presentation;

    b)  Assess vital signs;

    c)  Carefully evaluate the condition of the maternal and fetal patients upon presentation;

    d)  Evaluate the wellbeing of the unborn fetus through monitoring of the fetal heart rate and pattern and maternal contractions;

    e)  Perform appropriate blood and other laboratory testing in a patient demonstrating elevated and/or hypertensive blood pressures in the 3rd trimester of pregnancy;

    f)  Perform 24-hour urine testing in a patient demonstrating elevated and/or hypertensive blood pressures in the 3rd trimester of pregnancy;

    g)  Perform 24-hour urine testing in a patient demonstrating abnormalities on dip stick urine testing and urinalysis;

    h)  Initiate screening and baseline testing/evaluation/treatment in a patient with an obstetrical history that includes preeclampsia;

    i)  Recognize a patient at high-risk for gestational hypertension/pregnancy induced hypertension (PIH) and/or pre-eclampsia;

    j)  Recognize the signs and symptoms of gestational hypertension/pregnancy induced hypertension (PIH);

    k)  Recognize the early signs of preeclampsia;

    l)  Recognize the signs and symptoms of preeclampsia;

    m) Diagnose gestational hypertension/pregnancy induced hypertension (PIH);

    n)  Diagnose preeclampsia;

    o)  Treat the maternal patient for gestational hypertension/PIH/preeclampsia;

    p)  Initiate antenatal surveillance including periodic ultrasound evaluation for fetal growth, umbilical blood flow/cerebral blood flow in the fetus, amniotic fluid level, fetal breathing, fetal tone, and fetal movement;

q) Early serial testing and evaluation/re-evaluation in a patient at high-risk for preeclampsia and/or gestational hypertension/pregnancy induced hypertension (PIH);

r) Initiate antenatal surveillance including non-stress/contraction stress testing and biophysical profiling;

s) Initiate periodic fetoplacental assessment that includes umbilical artery doppler velocimetry;

t) Recognize and diagnose intrauterine growth restriction (IUGR) in the fetus;

u) Recognize a patient at risk for placental abruption;

v) Recognize and diagnose proteinuria;

w) Consult with high-risk obstetrics specialist/maternal fetal medicine for ongoing prenatal care and delivery plan;

x) Consider treating with steroids for fetal lung maturity;

y) Plan and prepare for induction or cesarean section delivery;

z) Plan and prepare for induction of labor and vaginal delivery;

aa) Plan for delivery at a facility with adequate maternal and neonatal intensive care resources;

bb) Timely deliver;

cc) Timely deliver by 37 weeks gestation;

dd) Monitor and interpret the fetal heart rate and pattern and respond appropriately;

ee) Supervise subordinate providers and clinicians including but not limited to resident physicians and nursing staff;

ff) Comply with Joint Commission standards;

gg) Any other violations of the standard of practice or care revealed during discovery.

8) Detroit Community Health Connection, Inc., acting directly and through its agents and employees, breached the applicable standard of practice or care when it did not timely and appropriately do all of the following:

a) Select, employ, train and monitor its employees, servants, agents, ostensible agents and/or its staff of physicians, nurses and nurse practitioners to ensure they were adequately trained, competent and qualified to perform optimum medical care to mothers and their babies.

8

b) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

c) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

d) Comply with Joint Commission Standards regarding credentialing and recredentialing of physicians by performing all of the following in an ongoing manner:

    i. Confirming current licensure and any disciplinary actions against the physician's license through a primary source;

    ii. Obtaining and documenting information from the National Practitioner Databank (NPDB);

    iii. Determining and documenting that physician is currently privileged at a Joint Commission-accredited organization;

    iv. Reviewing the physician's clinical performance;

    v. Reviewing the performance improvement activities of the physician pertaining to professional performance, judgment, and clinical or technical skills;

    vi. Confirming the physician's adherence to organization policies, procedures, rules, and regulations;

    vii. Providing a list to the physician of any limitations on the care, treatment, and services he or she can provide;

    viii. Confirming the physician is currently licensed, certified, and/or registered as required by law and regulation;

    ix. Investigate a physician's practice and licensure to ensure proper credentialing and re-credentialing before and after granting hospital privileges for quality of care;

e) Create, implement, and enforce protocols, policies, and procedures for care and treatment of the maternal and fetal patients during the prenatal period in compliance with Joint Commission Standards and Guidelines;

f) Truthfully and accurately document the patients' medical records;

g) Retain a full and complete legible copy of the medical records, and maintain and provide appropriate and adequate documentation including but not limited to audit trials, audit logs, and revision histories;

h) Create, implement, and enforce policies, protocols, and procedures intended to maximize patient safety including but not limited to the following:

    i.   Diagnosis of gestational hypertension/pregnancy induced hypertension (PIH);

    ii.   Recognition and diagnosis of preeclampsia;

    iii.   Manage with aspirin in light of history of preeclampsia;

    iv.   Delivery by 37 weeks in light of pregnancy induced hypertension (PIH)/gestational hypertension;

    v.   Monitoring of the fetal/placental condition in a patient at high-risk for preeclampsia and/or PIH/gestational hypertension;

    vi.   Treatment for pregnancy induced hypertension (PIH)/gestational hypertension/preeclampsia;

    vii.   Maintenance/preservation of a patient's medical chart.

i. Any other violations of the standards of practice or care that will be revealed during discovery.

9) DMC Primary Care Physicians, PC, acting directly and through its agents and employees, breached the applicable standard of practice or care when it did not timely and appropriately do all of the following:

a) Select, employ, train and monitor its employees, servants, agents, ostensible agents and/or its staff of physicians, nurses and nurse practitioners to ensure they were adequately trained, competent and qualified to perform optimum medical care to mothers and their babies.

b) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

c) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

d) Comply with Joint Commission Standards regarding credentialing and recredentialing of physicians by performing all of the following in an ongoing manner:

    i. Confirming current licensure and any disciplinary actions against the physician's license through a primary source;

    ii. Obtaining and documenting information from the National Practitioner Databank (NPDB);

    iii. Determining and documenting that physician is currently privileged at a Joint Commission-accredited organization;

    iv. Reviewing the physician's clinical performance;

    v. Reviewing the performance improvement activities of the physician pertaining to professional performance, judgment, and clinical or technical skills;

    vi. Confirming the physician's adherence to organization policies, procedures, rules, and regulations;

    vii. Providing a list to the physician of any limitations on the care, treatment, and services he or she can provide;

    viii. Confirming the physician is currently licensed, certified, and/or registered as required by law and regulation;

    ix. Investigate a physician's practice and licensure to ensure proper credentialing and re-credentialing before and after granting hospital privileges for quality of care;

e) Create, implement, and enforce protocols, policies, and procedures for care and treatment of the maternal and fetal patients during the prenatal period in compliance with Joint Commission Standards and Guidelines;

f) Truthfully and accurately document the patients' medical records;

g) Retain a full and complete legible copy of the medical records, and maintain and provide appropriate and adequate documentation including but not limited to audit trials, audit logs, and revision histories;

h) Create, implement, and enforce policies, protocols, and procedures intended to maximize patient safety including but not limited to the following:

    i. Diagnosis of gestational hypertension/pregnancy induced hypertension (PIH);

    ii. Recognition and diagnosis of preeclampsia;

   iii. Manage with aspirin in light of history of preeclampsia;

   iv. Delivery by 37 weeks in light of pregnancy induced hypertension (PIH)/gestational hypertension;

   v. Monitoring of the fetal/placental condition in a patient at high-risk for preeclampsia and/or PIH/gestational hypertension;

   vi. Treatment for pregnancy induced hypertension (PIH)/gestational hypertension/preeclampsia;

   vii. Maintenance/preservation of a patient's medical chart.

  i. Any other violations of the standards of practice or care that will be revealed during discovery.

_____

10) In order to have complied with the applicable standard of practice or care, Leslie D. Danley, MD and any physicians under her supervision should have timely and appropriately performed all of the following:

  a. Perform a complete history and physical upon the patient's presentation;

  b. Assess vital signs;

  c. Carefully evaluate the condition of the maternal and fetal patients upon presentation;

  d. Evaluate the wellbeing of the unborn fetus through monitoring of the fetal heart rate and pattern and maternal contractions;

  e. Perform appropriate blood and other laboratory testing in a patient demonstrating elevated and/or hypertensive blood pressures in the 3rd trimester of pregnancy;

  f. Perform 24-hour urine testing in a patient demonstrating elevated and/or hypertensive blood pressures in the 3rd trimester of pregnancy;

  g. Perform 24-hour urine testing in a patient demonstrating abnormalities on dip stick urine testing and urinalysis;

  h. Initiate screening and baseline testing/evaluation/treatment in a patient with an obstetrical history that includes preeclampsia;

  i. Recognize a patient at high-risk for gestational hypertension/pregnancy induced hypertension (PIH) and/or pre-eclampsia;

  j. Recognize the signs and symptoms of gestational hypertension/pregnancy induced hypertension (PIH);

k.  Recognize the early signs of preeclampsia;

l.  Recognize the signs and symptoms of preeclampsia;

m.  Diagnose gestational hypertension/pregnancy induced hypertension (PIH);

n.  Diagnose preeclampsia;

o.  Treat the maternal patient for gestational hypertension/PIH/preeclampsia;

p.  Initiate antenatal surveillance including periodic ultrasound evaluation for fetal growth, umbilical blood flow/cerebral blood flow in the fetus, amniotic fluid level, fetal breathing, fetal tone, and fetal movement;

q.  Early serial testing and evaluation/re-evaluation in a patient at high-risk for preeclampsia and/or gestational hypertension/pregnancy induced hypertension (PIH);

r.  Initiate antenatal surveillance including non-stress/contraction stress testing and biophysical profiling;

s.  Initiate periodic fetoplacental assessment that includes umbilical artery doppler velocimetry;

t.  Recognize and diagnose intrauterine growth restriction (IUGR) in the fetus;

u.  Recognize a patient at risk for placental abruption;

v.  Recognize and diagnose proteinuria;

w.  Consult with high-risk obstetrics specialist/maternal fetal medicine for ongoing prenatal care and delivery plan;

x.  Consider treating with steroids for fetal lung maturity;

y.  Plan and prepare for induction or cesarean section delivery;

z.  Plan and prepare for induction of labor and vaginal delivery;

aa. Plan for delivery at a facility with adequate maternal and neonatal intensive care resources;

bb. Timely deliver;

cc. Timely deliver by 37 weeks gestation;

dd. Monitor and interpret the fetal heart rate and pattern and respond appropriately;

ee. Supervise subordinate providers and clinicians including but not limited to resident physicians and nursing staff;

ff.  Comply with Joint Commission standards;

13

gg. Any other violations of the standard of practice or care revealed during discovery.

11) In order to have complied with the applicable standard of practice or care, Detroit Community Health Connection, Inc., acting directly and through its agents and employees, should have timely and appropriately performed all of the following:

a) Select, employ, train and monitor its employees, servants, agents, ostensible agents and/or its staff of physicians, nurses and nurse practitioners to ensure they were adequately trained, competent and qualified to perform optimum medical care to mothers and their babies.

b) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

c) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

d) Comply with Joint Commission Standards regarding credentialing and recredentialing of physicians by performing all of the following in an ongoing manner:

   i. Confirming current licensure and any disciplinary actions against the physician's license through a primary source;

   ii. Obtaining and documenting information from the National Practitioner Databank (NPDB);

   iii. Determining and documenting that physician is currently privileged at a Joint Commission-accredited organization;

   iv. Reviewing the physician's clinical performance;

   v. Reviewing the performance improvement activities of the physician pertaining to professional performance, judgment, and clinical or technical skills;

   vi. Confirming the physician's adherence to organization policies, procedures, rules, and regulations;

   vii. Providing a list to the physician of any limitations on the care, treatment, and services he or she can provide;

      viii.  Confirming the physician is currently licensed, certified, and/or registered as required by law and regulation;

      ix.  Investigate a physician's practice and licensure to ensure proper credentialing and re-credentialing before and after granting hospital privileges for quality of care;

e) Create, implement, and enforce protocols, policies, and procedures for care and treatment of the maternal and fetal patients during the prenatal period in compliance with Joint Commission Standards and Guidelines;

f) Truthfully and accurately document the patients' medical records;

g) Retain a full and complete legible copy of the medical records, and maintain and provide appropriate and adequate documentation including but not limited to audit trials, audit logs, and revision histories;

h) Create, implement, and enforce policies, protocols, and procedures intended to maximize patient safety including but not limited to the following:

      i.  Diagnosis of gestational hypertension/pregnancy induced hypertension (PIH);

      ii.  Recognition and diagnosis of preeclampsia;

      iii.  Manage with aspirin in light of history of preeclampsia;

      iv.  Delivery by 37 weeks in light of pregnancy induced hypertension (PIH)/gestational hypertension;

      v.  Monitoring of the fetal/placental condition in a patient at high-risk for preeclampsia and/or PIH/gestational hypertension;

      vi.  Treatment for pregnancy induced hypertension (PIH)/gestational hypertension/preeclampsia;

      vii.  Maintenance/preservation of a patient's medical chart.

i) Any other violations of the standards of practice or care that will be revealed during discovery.

12) In order to have complied with the applicable standard of practice or care, DMC Primary Care Physicians, PC, acting directly and through its agents and employees, should have timely and appropriately performed all of the following:

a) Select, employ, train and monitor its employees, servants, agents, ostensible agents and/or its staff of physicians, nurses and nurse practitioners to ensure they were adequately trained, competent and qualified to perform optimum medical care to mothers and their babies.

b) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

c) Create, implement, and enforce policies, protocols, and procedures for the privileging and credentialing of physicians to ensure they had adequate training and were competent and qualified to perform optimum medical care to mothers and their babies.

d) Comply with Joint Commission Standards regarding credentialing and recredentialing of physicians by performing all of the following in an ongoing manner:

    i. Confirming current licensure and any disciplinary actions against the physician's license through a primary source;

    ii. Obtaining and documenting information from the National Practitioner Databank (NPDB);

    iii. Determining and documenting that physician is currently privileged at a Joint Commission-accredited organization;

    iv. Reviewing the physician's clinical performance;

    v. Reviewing the performance improvement activities of the physician pertaining to professional performance, judgment, and clinical or technical skills;

    vi. Confirming the physician's adherence to organization policies, procedures, rules, and regulations;

    vii. Providing a list to the physician of any limitations on the care, treatment, and services he or she can provide;

    viii. Confirming the physician is currently licensed, certified, and/or registered as required by law and regulation;

    ix. Investigate a physician's practice and licensure to ensure proper credentialing and re-credentialing before and after granting hospital privileges for quality of care;

e) Create, implement, and enforce protocols, policies, and procedures for care and treatment of the maternal and fetal patients during the prenatal period in compliance with Joint Commission Standards and Guidelines;

f) Truthfully and accurately document the patients' medical records;

g) Retain a full and complete legible copy of the medical records, and maintain and provide appropriate and adequate documentation including but not limited to audit trials, audit logs, and revision histories;

h) Create, implement, and enforce policies, protocols, and procedures intended to maximize patient safety including but not limited to the following:

   i. Diagnosis of gestational hypertension/pregnancy induced hypertension (PIH);

   ii. Recognition and diagnosis of preeclampsia;

   iii. Manage with aspirin in light of history of preeclampsia;

   iv. Delivery by 37 weeks in light of pregnancy induced hypertension (PIH)/gestational hypertension;

   v. Monitoring of the fetal/placental condition in a patient at high-risk for preeclampsia and/or PIH/gestational hypertension;

   vi. Treatment for pregnancy induced hypertension (PIH)/gestational hypertension/preeclampsia;

   vii. Maintenance/preservation of a patient's medical chart.

i) Any other violations of the standards of practice or care that will be revealed during discovery.

_____

13) As a result of the aforementioned breaches of the standard of practice or care of Leslie D. Danley, MD and any physicians under her supervision, Elijah Kellems suffered decreased oxygenation before his delivery which caused catastrophic and permanent injuries that include hypoxic ischemic encephalopathy, seizure disorder, severe neurological injuries that include cognitive and physical impairments, cerebral palsy, mental retardation, and developmental delays, and permanent multi-organ damage and/or dysfunction.

14) As a result of the aforementioned breaches of the standard of practice or care of Detroit Community Health Connection, Inc., acting directly and through its agents and employees, Elijah Kellems suffered decreased oxygenation before his delivery which caused catastrophic and permanent injuries that include hypoxic ischemic encephalopathy, seizure disorder, severe neurological injuries that include cognitive and physical impairments, cerebral palsy, mental retardation, and developmental delays, and permanent multi-organ damage and/or dysfunction.

15) As a result of the aforementioned breaches of the standard of practice or care of DMC Primary Care Physicians, PC, acting directly and through its agents and employees, Elijah Kellems suffered decreased oxygenation during his delivery which caused catastrophic and permanent injuries that include hypoxic ischemic encephalopathy, seizure disorder, severe neurological injuries that include cognitive and physical impairments, cerebral palsy, mental retardation, and developmental delays, and permanent multi-organ damage and/or dysfunction.

16) The opinions expressed in this Affidavit are based upon the documents and materials referred to in the paragraphs above, and are subject to modification based upon additional information which might be provided at some future date.

_____
Andrew B. Bokor, M.D.

18

Subscribed and sworn to (or affirmed) before me on this _5_ day of _April_, 2022, by _Andrew B. Bokor_, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____
Notary Public

My Commission expires: _04/05/2025_

JENNIFER M. JONES
Notary Public, State of Ohio
Commission No. 2020-RE-813344
My Commission Expires
April 5, 2025

NOTARIAL SEAL
STATE OF OHIO

19