UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TANISHA BOWERS, et al.,

     Plaintiffs,

v.

UNITED STATES OF AMERICA,

     Defendant.

Case No. 22-10792
Honorable Laurie J. Michelson

---

## ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [44]

In 2019, Tanisha Bowers was pregnant with her second son. She sought prenatal care at Detroit Community Health Connection, a federally funded clinic. For many months of her pregnancy, aside from some pelvic pain, Bowers thought everything was proceeding normally. But that all changed on April 15, 2020. At 1:00 a.m. that morning, Bowers suffered intense abdominal pain, and her partner rushed her to St. John Hospital. Ultimately, doctors discovered that Bowers had suffered a near complete placental abruption and that her baby was not receiving enough oxygen to his brain. The doctors then performed an emergency cesarian section.

Unfortunately, the lack of oxygen to EK's brain caused severe and permanent damage. Now, at four years old, EK is unable to stand on his own, grip objects, roll over, or feed himself. He suffers from hearing loss and has several seizures a day. And he will require round-the-clock nursing care for the rest of his life.

In 2022, Plaintiffs—Bowers, her partner Bryan Kellems, and EK's conservator Linda Bobrin—brought this medical malpractice lawsuit alleging that Dr. Leslie Danley, Bowers' doctor at DCHC, was negligent in her prenatal care of Bowers. (ECF No. 1.) As Dr. Danley was employed at a federally funded clinic, the United States substituted in as the proper defendant. (ECF No. 22.) Now before the Court is Plaintiffs' motion for partial summary judgment on liability. (ECF No. 44.) They say that but for Dr. Danley's substandard care, Bowers would not have experienced a placental abruption and EK would not have suffered permanent brain damage. The government disagrees. (ECF No. 55.)

Because the Court finds that there is no genuine issue of material fact that (1) Dr. Danley violated the applicable standard of care when treating Bowers and that (2) her violations were the proximate cause of EK's injuries, it will GRANT the motion.

## I. Background

In 2011, Dr. Leslie Danley began providing obstetric prenatal care at Detroit Community Health Connection, a federally funded community health clinic that provides care to patients who could not otherwise afford it. (ECF No. 55, PageID.3447.) While Dr. Danley had completed a residency in obstetrics, she was not a board-certified obstetrician. (ECF No. 44-5, PageID.373–375.) Nor did she have admitting privileges at any hospital. (*Id.* at PageID.346.)[1]

---

[1] Dr. Danley no longer works for DCHC. She was fired in March of 2021, after she came to work intoxicated and lied to her supervisor regarding her alcohol consumption. (ECF No. 55-2 (deposition of Dr. Shade).) Both parties make many

2

In October of 2019, Tanisha Bowers began receiving prenatal care at DCHC. This was Bowers' third pregnancy. Her second had resulted in an induced preterm delivery at 32 weeks' gestation after she had developed preeclampsia. (ECF No. 44, PageID.201; ECF No. 55, PageID.3449.) Preeclampsia is a pregnancy complication characterized by "new-onset hypertension, which occurs most often after 20 weeks of gestation and frequently near term." (ECF No 44-4, PageID.300 (American College of Obstetricians and Gynecologists Practice Bulletin).) It is often accompanied by proteinuria—protein in the urine. (*Id.*; ECF No. 44-15, PageID.699 (deposition of Dr. Bokor); ECF No. 44-16, PageID.843 (deposition of Dr. Landon).) Preeclampsia increases the risk of still birth and placental abruption—i.e., premature separation of the placenta from the uterine wall. (ECF No. 44-5, PageID.450 (deposition of Dr. Danley); ECF No. 44-17, PageID.972–973 (deposition of Dr. Jones).)

If gestational hypertension is diagnosed before 37 weeks, the general practice is to induce delivery at no later than 37 weeks and zero days, in part to prevent the pregnant patient from developing preeclampsia. (ECF No. 44-16, PageID.851 (Dr. Landon); ECF No. 44-17, PageID.985–986 (Dr. Jones).) If gestational hypertension develops after 37 weeks, the general practice is to induce delivery at diagnosis. (ECF No. 44-17, PageID.985–986 (Dr. Jones).) Due to Bowers' history of severe preeclampsia in her previous pregnancy, she was at an increased risk for developing preeclampsia again. (ECF No. 44-5, PageID.450–451 (Dr. Danley); ECF No. 44-16,

---

assertions as to whether Dr. Danley had a substance abuse problem that affected her treatment of Bowers. But that allegation, albeit serious, does not have an impact on the disposition of this case. So the Court will not address it further.

PageID.852 (Dr. Landon); ECF No. 44-17, PageID.971–972 (Dr. Jones); ECF No. 55-6, PageID.3764–3765 (American Journal of Obstetrics & Gynecology Expert Review).)

Bowers had her first appointment with Dr. Danley on October 24, 2019. (ECF No. 54-11, PageID.3233; ECF No. 44-5, PageID.390.) At that appointment, Bowers told Dr. Danley about her history of hypertension and preeclampsia during her second pregnancy. (ECF No. 54-11, PageID.3230.) There were no issues observed during that visit. And for the next three months, Bowers reported no medical complications.

In late 2019, things changed. Bowers began to experience severe lower pelvic pain. (*Id*. at PageID.3225 ("[H]ow I explained it to [Dr. Danley] was like someone was ripping my bones apart in my pelvis . . . .").) She claims that while she has never been a habitual marijuana user, she asked Dr. Danley if she could smoke marijuana to manage some of her pain, and Dr. Danley told her she could. (*Id*.) Dr. Danley does not recall that interaction. (ECF No. 44-5, PageID.552.) Bowers also says that over the course of her pregnancy, she used marijuana a total of "two or three times" but stopped when she realized it was ineffective and her pelvic pain did not subside. (ECF No. 54-11, PageID.3261.)

On March 23, 2020, at 34 weeks' gestation, Bowers had another appointment with Dr. Danley. (ECF No. 44, PageID.201; ECF No. 44-5, PageID.408, 460.) At that time, Dr. Danley documented that Bowers had an elevated blood pressure of 145/80. (ECF No. 44-3, PageID.298.) A normal blood pressure is generally around 120/80. (*Id*. at PageID.403.) In her deposition, Dr. Danley testified that "it is her practice to repeat the blood pressure" if the first reading is elevated and believes that she may have

taken another reading during that appointment. (*Id.* at PageID.424–425.) But there is no record of a second blood pressure reading on this date and Dr. Danley has "no idea" what this alleged reading might have been. (*Id.* at PageID.427–428.) For her part, Bowers claims that she was never told what her vitals were or whether her blood pressure was elevated. (ECF No. 54-11, PageID.3262.)

One week later, on March 30, 2020, Bowers returned for another appointment. She was at 35 weeks' gestation and Dr. Danley recorded two elevated blood pressures of 142/95 and 138/91. (ECF No. 44-3, PageID.298 (Footprint Card); ECF No. 44-5, PageID.416 (Dr. Danley).) At that point, Plaintiffs believe Dr. Danley should have diagnosed Bowers with gestational hypertension (ECF No. 44, PageID.203), which the American College of Obstetricians and Gynecologists defines "as a systolic blood pressure [top number] of 140 mg Hg or more or a diastolic blood pressure [bottom number] of 90 mm Hg or more, or both, on two occasions at least 4 hours apart after 20 weeks of gestation in a woman with a previously normal blood pressure." (ECF No. 44-4, PageID.301 (ACOG Practice Bulletin).) Every medical professional in this case, including Dr. Danley, agrees on this definition of gestational hypertension. (*See, e.g.*, ECF No. 44-5, PageID.409 (Dr. Danley); ECF No. 44-15 (Dr. Bokor); ECF No. 44-16, PageID.843 (Dr. Landon).)[2]

---

[2] But the government does not. It suggests that "if an initial blood pressure is elevated, a second blood pressure should be taken and, if that blood pressure is in the normal range, the clinician *may disregard the initially elevated measurement and rule out gestational hypertension.*" (ECF No. 55, PageID.3455 (emphasis added).) In support, the government relies on chapters of a medical textbook and a publication called "UpToDate." (*Id.*) But none of the experts in this case rely on either of these materials in formulating their opinions. As Plaintiffs respond, and as will be

At the conclusion of the March 30 appointment, Dr. Danley scheduled Bowers for an ultrasound one week later, on April 6, 2020, to determine if her baby was growing normally. But when Bowers arrived for that appointment, she learned it had been canceled by Dr. Danley's office. (ECF No. 44-8, PageID.567 (Appointment Schedule).)

So Bowers returned one week later on April 13. At that point, Bowers was at 37 weeks' gestation.[3] (ECF No. 44-5, PageID.417 (Dr. Danley); ECF No. 44-17, PageID.964 (Dr. Jones).) A nurse took her blood pressure, and it was elevated again— 157/91. (ECF No. 44-2, PageID.293; ECF No. 44-5, PageID.416, 440.) According to Bowers, the nurse left to the room and informed Dr. Danley that "[Bowers'] blood pressure was really high." (ECF No. 54-11, PageID.3268.) Just like the March 30 appointment, Dr. Danley claims that she took a second blood pressure reading which showed that Bowers was "okay," but failed to record that measurement in Bowers' chart. (ECF No. 44-5, PageID.424–425.)

At this point, Dr. Danley believed that Bowers was "moving towards gestational hypertension." (*Id.* at PageID.422.) She collected a urine sample from

discussed later, defense counsel cannot "[c]ite medical literature that is not supported by retained experts" to manufacture a genuine issue of material fact. (ECF No. 56, PageID.4052.)

[3] The government disputes that Bowers was 37 weeks and 3 days pregnant when she gave birth. (ECF No. 55, PageID.3465.) But no medical professional disputes that fact. (*See, e.g.*, ECF No. 44-10, PageID.605 (St. John's Operative Reports); ECF No. 44-9, PageID.575 (St. John's Discharge Documentation); ECF No. 44-21, PageID.1080 (Dr. Bedrick).) Again, as will be explained in more detail below, merely contesting this medical fact without any support from a medical professional, does not create a genuine dispute of material fact in a medical malpractice case. *See Cobb v. Keystone Memphis, LLC*, 526 F. App'x 623, 630 (6th Cir. 2013).

Bowers that showed a protein value of 0.3+.[4] (ECF No. 44-2, PageID.293.) Because there was protein in Bowers' urine, Dr. Danley instructed Bowers to complete a 24-hour urine collection six days later—i.e., on April 19, the Sunday before her next Monday appointment. (ECF No. 44-5, PageID.442–44; ECF No. 54-11, PageID.3271.) But Dr. Danley concedes that she did nothing to move Bowers towards delivery. (ECF No. 44-5, PageID.445.) And at no point did Dr. Danley tell Bowers that she should monitor her blood pressure at home. (ECF No. 54-11, PageID.3281.)

Two days later, on April 15, 2020, Bowers began experiencing contractions around 9:00 p.m. (*Id.* at PageID.3277.) By 1:00 a.m., the pain became far more intense, and Bowers' partner rushed her to the emergency room at St. John Hospital. (*Id.* at PageID.3279.) Soon after Bowers arrived, she gave birth to baby EK by emergency cesarian section. Although St. John staff acted swiftly, a near complete placental abruption had occurred. (ECF No. 44-10, PageID.605 (St. John's Operative Reports); ECF No. 44-15, PageID.713 (Dr. Bokor); ECF No. 44-17, PageID.1009 (Dr. Jones).) This is when the placenta prematurely detaches from the uterus before delivery of the fetus. (ECF No. 55-5, PageID.3762 (AJOG Expert Review); ECF No. 44-15, PageID.721 (Dr. Bokor).) Experts believe Bowers' placental abruption occurred around the time that she arrived at the hospital on April 16, 2020, which is consistent

---

[4] Bowers was apparently spilling protein in her urine in different amounts throughout her pregnancy. For instance, urinalyses showed protein values of 1+ at her early January appointment (ECF No. 44-2, PageID.277) and 30+ in late January (*id.* at PageID.281) and early February (*id.* at PageID.284).

with her report of intense abdominal pain. (ECF No. 44-15, PageID.714, 742 (Dr. Bokor); ECF No. 55-13, PageID.3923 (Dr. Bedrick).)

Bowers' baby, EK, suffered severe hypoxic ischemic encephalopathy (HIE), a brain injury caused by a lack of oxygen to the brain. (ECF No. 44, PageID.199–200; ECF No. 55, PageID.3447.) While doctors were able to resuscitate EK at birth, he suffers from spastic quadriplegia cerebral palsy, laryngomalacia, hearing loss, frequent seizures, and severe cognitive impairments. He will require round-the-clock nursing care for the rest of his life. (ECF No. 44, PageID.197, 200.)

Plaintiffs contend that Dr. Danley's prenatal treatment of Bowers, or lack thereof, constitutes malpractice and caused EK's injuries. On October 7, 2024, following substantial fact and expert discovery, Plaintiffs moved for partial summary judgment on liability, arguing there is no genuine dispute of material fact that (1) Dr. Danley violated the standard of care and (2) these violations proximately caused EK's injuries. (*See generally* ECF No. 44.) The government believes fact issues exist and opposed the motion. (ECF No. 55, PageID.3463 (responding that "plaintiffs are not entitled to summary judgment because there is a genuine dispute of fact regarding whether Dr. Danley appropriately managed Bowers' prenatal care" and whether "Dr. Danley's management proximately caused the placental abruption that caused EK's hypoxic ischemic injuries just before delivery").)

The motion is fully briefed and does not require further argument. *See* E.D. Mich. LR 7.1(f).

8

## II. Standards

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute is "genuine" if the evidence permits a reasonable fact-finder to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *See Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quoting Fed. R. Civ. P. 56(e)).

### B. Medical Malpractice—The Law

Sovereign immunity prevents suit against the United States without its consent. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Such consent exists under 42 U.S.C. § 233(a) for malpractice claims based on the conduct of employees of federally funded community health clinics—like DCHC. For these claims, the United States' liability is determined by the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1). The FTCA, in turn, adopts the negligence law of the state where the alleged

negligence occurred. 28 U.S.C. § 1346(b)(1); *Premo v. United States*, 599 F.3d 540, 545 (6th Cir. 2010). Here, that is Michigan.

Under Michigan law, a plaintiff bringing a cause of action for medical malpractice must establish the following: (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care. *See Craig ex rel. Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 308 (Mich. 2004).

With respect to the first element, standard of care, Michigan law further provides that if the defendant is a specialist—like an obstetrician—plaintiff must demonstrate that the defendant failed "to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury." Mich. Comp. Law § 600.2912a(1)(b).

As for the second element, causation, "the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant." Mich. Comp. Law § 600.2912a(2).

"In order to be a proximate cause, the negligent conduct must have been a cause of the plaintiff's injury and the plaintiff's injury must have been a natural and probable result of the negligent conduct. These two prongs are respectively described

as 'cause-in-fact' and 'legal causation.'" *O'Neal v. St. John Hosp. & Med. Ctr.*, 791 N.W.2d 853, 858 (Mich. 2010) (citing *Skinner v. Square D Co.*, 516 N.W.2d 475, 479–480 (1994)). "While legal causation relates to the foreseeability of the consequences of the defendant's conduct, the cause-in-fact prong 'generally requires showing that but for the defendant's actions, the plaintiff's injury would not have occurred.'" *Id.* (quoting *Skinner*, 516 N.W.2d at 479). Proximate causation in a malpractice claim is treated no differently than in an ordinary negligence claim, and "it is well-established that there can be more than one proximate cause contributing to an injury." *Id.* (citing *Brisboy v. Fibreboard Corp.*, 418 N.W.2d 650, 653 (Mich. 1988)). In other words, the defendant's negligence "must be '*a* proximate cause' not '*the* proximate cause.'" *Id.* at 859 (emphasis added) (quoting *Kirby v. Larson*, 256 N.W.2d 400, 410 (Mich. 1977)).

Importantly, Michigan law requires that both the applicable standard of care and causation be established by expert testimony. *Pennington v. Longabaugh*, 719 N.W.2d 616, 618 (Mich. Ct. App. 2006); *Thomas v. McPherson Cmty. Health Ctr.*, 400 NW.2d 629, 631 (Mich Ct. App. 1986) ('This Court has recognized that in medical malpractice cases issues of negligence and causation are normally beyond the ken of laymen. Thus, in an action for malpractice against a hospital, expert testimony is required to establish the applicable standard of conduct, the breach of that standard, and causation.").

There are several experts in this case. Relevant here, Plaintiffs' experts include: Dr. Andrew Bokor, a board-certified obstetrician and gynecologist who is the Chair of the Department of OBGYN at Grant Medical Center (ECF No. 44-20,

PageID.1075); Dr. Mark Landon, a board-certified obstetrician and current Chairman of the Department of Obstetrics and Gynecology at The Ohio State University College of Medicine (ECF No. 44-19, PageID.1071); and Dr. Alan Bedrick, a neonatologist and current Professor Emeritus of Pediatrics and former Chief of Neonatology and Developmental Biology at the University of Arizona College of Medicine (ECF No. 44-21, PageID.1080). The government's experts include: Dr. Theodore Jones, a board-certified obstetrician and Director of Maternal Fetal Medicine at Corewell Health Dearborn Hospital (ECF No. 65, PageID.5643); and Dr. Johnathan Fanaroff, a practicing Neonatologist and a Professor of Pediatrics at Case Western Reserve University School of Medicine (ECF No. 44-24, PageID.1098).

With this background, the Court will now apply these legal standards to the undisputed facts to determine if the government is liable as a matter of law.

### III. Standard of Care and Breach

Plaintiffs contend that the standard of care in this case required Dr. Danley to (1) provide aspirin to Bowers to prevent gestational hypertension, (2) diagnose Bowers with gestational hypertension, and (3) treat Bowers for gestational hypertension, i.e., deliver the baby at 37 weeks' gestation. Dr. Danley violated this standard of care, argue Plaintiffs, by failing to take any of these steps. The Court addresses each of these arguments in turn.

### A. Aspirin

Plaintiffs correctly assert that "[e]very obstetrical expert, including [the government's] expert, Theodore Jones, M.D., has testified Dr. Danley violated the

standard of care by not prescribing aspirin." (ECF No. 44, PageID.207.) For example, Dr. Bokor (ECF No. 44-20, PageID.1075) states in his expert report that the applicable "[s]tandard of care required [Dr. Danley] to initiate low dose aspirin therapy to mitigate the risk of recurrence of early or late onset severe preeclampsia" (ECF No. 44-20,PageID.1076). Likewise, Dr. Landon opined that Dr. Danley "failed to meet acceptable standards of care for the prenatal care of Tanisha Bowers" by failing "to prescribe low dose aspirin prophylaxis for preeclampsia as recommended by ACOG (given Ms. Bowers' history of prior preeclampsia)." (ECF No. 44-19, PageID.1072.) In his deposition testimony, Dr. Landon further highlighted the importance of prescribing aspirin, explaining how it "interferes with prostaglandin synthesis" to prevent the onset of preeclampsia. (ECF No. 44-16, PageID.839.)

The government's expert, Dr. Jones, concluded in his report that "[t]he medical record in this case does not support a conclusion to a reasonable degree of medical certainty that Dr. Danley's determination not to prescribe Ms. Bowers low-dose aspirin caused any of the alleged harm in this case." (ECF No. 65-1, PageID.5643.)[5] But Dr. Jones' report made no conclusions as to whether the standard of care in this

---

[5] Dr. Jones clarified in his deposition that he made this comment in his report because some studies show only a 2 to 5 percent reduction in preeclampsia for patients on low-dose aspirin and because "there is no guarantee of a prevention of preeclampsia or hypertensive diseases in pregnancy in any person that takes aspirin." (ECF No. 44-17, PageID.994.) But he also acknowledged that "in any person that takes aspirin . . . there's a higher chance that [preeclampsia or hypertensive diseases in pregnancy] may be prevented than if [aspirin] wasn't used" and that studies using higher doses of aspirin have shown reductions in preeclampsia "as high as 30 percent." (*Id.*)

case would have required Dr. Danley to prescribe aspirin. He said as much during his

deposition:

> Q. Okay. And so . . . low-dose aspirin in this patient in 2019, given her history of preeclampsia in 2008, was standard of care, correct?
>
> A. . . . it was recommended to be used by clinicians when they identified the patient as having preeclampsia.
>
> . . .
>
> Q. Okay. Standard of care required that Dr. Danley discuss low-dose aspirin with this patient early on in her pregnancy; fair to say?
>
> A. That is not an unreasonable statement. Yes.

(ECF No. 44-17, PageID.996–997.)

Resisting this conclusion by its own expert, the government maintains that "[a]t the time of Bowers' pregnancy, maternal fetal medicine specialists who exclusively treated high-risk patients may have routinely prescribed aspirin during pregnancy, but regular obstetricians like Dr. Danley did not." (ECF No. 55, PageID.3450.) In support, the government relies exclusively on Dr. Danley's testimony. But Dr. Danley was only testifying about her individual practice. She never said that "regular obstetricians" are not in the practice of prescribing aspirin. Instead, she testified that it "wasn't [her] practice to implement aspirin [herself]" (ECF No. 44-5, PageID.480) and that she "would not have used low dose aspirin without getting a consultation with [maternal fetal medicine specialists]" (*id.* at PageID.484). She clarified that she would have sought that consult with Hutzel Women's Hospital's high-risk pregnancy clinic as there were no MFM specialists "on staff at the site." (*See id.* at PageID.484–485.)

That Dr. Danley had a different "practice" with respect to prescribing aspirin does not create a genuine dispute of material fact—instead, it is an admission that she failed to follow the proper standard of care in this case.

The government also contends that it was acceptable for Dr. Danley to refrain from prescribing aspirin until she received further guidance from a MFM specialist. But this is at odds with the government's own expert—himself an MFM specialist—who said that he "would not have expected [Dr. Danley] to defer to a maternal fetal medicine specialist for that recommendation" (ECF No. 44-17, PageID.1001) and that he believes prescribing aspirin "would be something that would still be in the purview of a generalist" like Dr. Danley (*id.* at PageID.998). More significant, though, Dr. Danley never did consult with an MFM specialist, which the government's expert also concedes would be a breach of the standard of care:

> Q. Okay. So if it's Dr. Danley's position at trial that she was going to defer to MFM, then the standard of care would have required her to consult with MFM, right?
>
> A. One would think so.
>
> Q. Okay. And she didn't do that in this case, correct?
>
> A. It did not happen. I don't think so. No.
>
> Q. That would be a violation of the standard of care on Dr. Danley's part, correct?
>
> A. It would not—yes. It would not be standard of care. Yes.

(*Id.* at PageID.1001–1002.)

15

Thus, the Court finds that there is no genuine issue of material fact that Dr. Danley's failure to prescribe aspirin to Bowers during her pregnancy violated the standard of care.

## B. Diagnosing Gestational Hypertension

The next violation of the standard of care, say Plaintiffs, was Dr. Danley's failure "to diagnose gestational hypertension at the latest by March 30, 2020." (ECF No. 44, PageID.207.) But the government believes there is a fact issue as whether Bowers ever had gestational hypertension. (ECF No. 55, PageID.3464.) Once again, the government primarily relies on Dr. Danley's testimony for this assertion. (*See id.*)

Throughout her deposition, Dr. Danley seemed to suggest that because she did not *diagnose* Bowers with gestational hypertension, Bowers did not *have* gestational hypertension. The following testimony reveals this flawed premise:

> Q. Just so the record's clear, with three blood pressures between 3-23 and 3-30, one at 145 over 80, one at 142 over 95, and another at 138 over 91, this patient in your opinion, in your expert opinion, did not have gestational hypertension on March 30th; is that correct?
>
> A. I did not diagnose her with gestational hypertension.
>
> Q. I know that. I'm asking your opinion as you sit here today. Three elevated blood pressures taken over a week's time in this patient, it's your position as you sit here today, that this patient did not have gestational hypertension on March 30th, 2020; is that right?
>
> A. At 3-30 I did not diagnose her with gestational hypertension based on the evaluation that I did.
>
> . . .
>
> Q. Doctor, I know what you did and didn't do at the time. I'm asking you about today. I'm asking for your professional opinion. Is it your opinion—are you going to go before the judge in this case and tell the

judge that it's your opinion that this patient did not have gestational hypertension on March 30th?

A. It's my opinion that I evaluated her blood pressure and did not diagnose her with gestational hypertension.

. . .

Q. Doctor, we can keep doing this until I get an answer to my question. My question is, do you have an opinion today that the patient did not have gestational hypertension on March 30th?

A. My opinion is I correctly evaluated her blood pressures at the time.

. . .

Q. Doctor, I want to know what your opinion is today. Doctor, what's your opinion today?

A. I don't have an opinion on that right today.

(ECF No. 44-5, PageID.435–439.)

Of course, simply because a healthcare professional fails to diagnose a patient with a particular illness does not mean that patient does not have that illness. Once again, the fact that Dr. Danley did not diagnose gestational hypertension does not create a genuine issue of material fact but is instead an admission that she violated the standard of care. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts"); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[T]he party opposing [a motion for summary judgment] may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an

affirmative showing with proper evidence in order to defeat the motion." (internal quotation marks omitted)).

To further explain, Dr. Danley agrees that: (1) Bowers' blood pressure readings were accurate; (2) on March 23 and 30 as well as on April 13 they were all elevated; and (3) the ACOG's definition of gestational hypertension as two elevated blood pressure readings taken at least four hours apart after 20 weeks of gestation in a woman with a previously normal blood pressure is accurate. Thus, she should have diagnosed Bowers with gestational hypertension.

And every other medical professional in this case agrees—by March 30, 2020, Dr. Danley should have diagnosed Bowers with gestational hypertension. Dr. Bokor concluded in his expert report that "[c]ertainly by the visit on [March 30] when [Bowers] exhibited 2 elevated blood pressures, the diagnosis of gestational hypertension should have been made, thus meeting the standard of care. That diagnosis was never made." (ECF No. 44-22, PageID.1077.) Likewise, Dr. Landon concluded that Dr. Danley "failed to recognize the development of preeclampsia and/or gestational hypertension at 35 weeks gestation."[6] (ECF No. 44-19, PageID.1072.)

In his deposition, Dr. Landon put a finer point on how gestational hypertension is typically diagnosed in practice. He explained that while hypertension is "classically

---

[6] Since preeclampsia is, in effect, gestational hypertension *plus* proteinuria, Dr. Landon's use of "and/or" is of no consequence. Dr. Landon essentially concluded in his report that Dr. Danley should have diagnosed Bowers with gestational hypertension *or worse* at 35 weeks.

defined" as two elevated blood pressures at least four hours apart, "if somebody has an elevated blood pressure, and it's less than four hours and it's repeated and it's elevated—or even a single measurement, and then they come back . . . and they have an elevated blood pressure, say, a week later . . . they would be designated as a gestational hypertension." (ECF No. 44-16, PageID.843–844.) He also points out there were other indicators that Bowers had gestational hypertension. For example, her weight gain. As Dr. Landon explained, "pregnant women generally don't gain more than a pound per week in the final weeks of pregnancy." (*Id.* at PageID.849.) And if they gain several pounds within a week, that is a sign that they might be developing preeclampsia. (*Id.*) Here, Bowers had a four-pound weight gain between her March 23 and March 30 appointments. (*Id.* at PageID.851.) So, for a woman over 20 weeks' pregnant with three elevated blood pressure readings, a four-pound weight gain over a week, and a history of preeclampsia, "there should be absolutely no reason to doubt the diagnosis" of gestational hypertension. (*Id.* at PageID.852.)

Even the government's expert, Dr. Jones, agrees that Bowers had undiagnosed gestational hypertension. (ECF No. 44-17, PageID.1012 ("Q. And Doctor, I just want to confirm. Your opinion in this case is that this patient had gestational hypertension as of March 23rd, 2020, correct? A. Yes."); *id.* at PageID.976 ("Q. this patient had gestational hypertension that arose in the third trimester, agree? A. Yes.").)

Thus, the Court finds that there is no genuine dispute of material fact that Dr. Danley failed to diagnose Bowers with gestational hypertension and that this failure violated the standard of care.

### C. Delivery

Every retained doctor in this case also agrees that the standard of care for a pregnant person with gestational hypertension is to deliver the baby at 37 weeks' gestation. Thus, Plaintiffs contend that Dr. Danley's failure to admit Bowers for delivery by April 13, 2020, violated the standard of care as well.

For instance, Dr. Bokor opined that the "standard of care required delivery to be done by 37 0/7 weeks at the latest." (ECF No. 44-20, PageID.1077.) He testified consistently in his deposition that "delivery should have happened by 37 weeks and zero days" and that, if Bowers delivered then, "clearly this abruption [wouldn't have] happened." (ECF No. 44-15, PageID.767.) Similarly, Dr. Landon concluded in his expert report that "[t]he standard of care for the management of either gestational hypertension or preeclampsia is delivery by 37 weeks gestation." (ECF No. 44-19, PageID.1072.)

It is true that Dr. Jones stated in his report that "[d]epending on the other clinical indicators available to Dr. Danley, a physician in Dr. Danley's position on April 13, 2020, could reasonably have considered measures other than scheduling Ms. Bowers for immediate delivery, which would have carried its own risks." (ECF No. 65-1, PageID.5643.) But he then clarified in his deposition that Dr. Danley's choice not to send Bowers to the hospital for delivery at 37 weeks' gestation was a violation of the standard of care. (*Id*. at PageID.1004–1005 ("Q. The fact that the patient has gestational hypertension and she's 37 weeks gestation means she must be sent to the hospital and delivered, either induce or a C-section, agree? A. I would agree that's

20

standard of care. Q. And in that respect, Dr. Danley violated the standard of care. A. Yes."); *see also id.* at PageID.987 ("Q. [I]n this particular patient's state or condition on the 23rd of March, standard of care would have required a plan management for delivery at 37 weeks gestation, induction or a C-section depending on the circumstances, agree? A. Yeah, unless there was other circumstances that I'm not aware of.").) Dr. Jones also testified that Dr. Danley's choice to delay a 24-hour urine collection until April 19, 2020, violated the standard of care. (ECF No. 44-17, PageID.1004.)

In the face of this consistent testimony by medical experts, the government argues that "even if Bowers had gestational hypertension, the standard of care allowed delivery at least up to 38 weeks 6 days gestation, but the delivery occurred at 36 weeks gestation by one measure and 37 weeks, 3 days gestation by another." (ECF No. 55, PageID.3469.) This is not properly supported by any of the medical experts.

Instead, the government relies on a publication from "UpToDate," an excerpt from a medical textbook, and an article on "Timing of Indicated Late-Preterm and Early-Term Birth." (*Id.*) But recall that in a medical malpractice case, Michigan law requires expert testimony, not a lawyer's independent research, to establish the standard of care. *See Kava v. Peters*, 450 F. App'x 470, 475 (6th Cir. 2011) ("Michigan courts require expert testimony in medical-malpractice cases, particularly for establishing the applicable standard of care . . . .").

That leaves the government's suggestion that EK may have actually been born at 36 weeks' gestation, and not at 37 weeks and three days. (ECF No. 55, PageID.3469.) This comes from EK's "Ballard Score," a way to estimate gestational age through measurements and observations made by hospital staff after a baby is born. (ECF No. 44-11, PageID.621.) The government believes the difference between 36 and 37 weeks' gestation is relevant because "[e]ven if Bowers had gestational hypertension, there is a dispute of fact regarding whether relevant obstetrical guidelines would have required Dr. Danley to schedule Bowers for an induction prior to April 16, 2020" given that "[n]o published guideline requires delivery before 36 weeks" for patients with gestational hypertension. (ECF No. 55, PageID.3465.)

There are several flaws in this argument. First, no expert in this case concludes that EK was born at 36 weeks' gestation. Indeed, Drs. Bokor (ECF No. 44-20, PageID.1076–1077), Landon (ECF No. 44-19, PageID.1072), Bedrick (ECF No. 44-21, PageID.1081), Jones (ECF No. 44-17, PageID.964), and Dr. Fanaroff (ECF No. 44-24, PageID.1099), all say that EK was at delivered at 37 weeks and three days' gestation.[7]

Second, whether Dr. Danley violated the standard of care is evaluated based on what a reasonable and prudent obstetrician should have done under the circumstances. And, as evidenced in Bowers' medical records and Dr. Danley's

---

[7] Despite this opinion in his report, Dr. Fanaroff testified that he "was not exactly sure" of EK's gestational age. (ECF No. 44-25, PageID.1131.) He further testified, however, that he had no reason to doubt the conclusions of every other medical professional in this case. (*Id.* at PageID.1331–1332.)

deposition, Dr. Danley believed that Bowers was at 37 weeks' gestation. (ECF No. 44-2, PageID.265–267, 275 (Ultrasound Reports); ECF No. 44-3, PageID.298 (Footprint Card); ECF No. 44-5, PageID.469 (Dr. Danley).) Further, as Dr. Bokor explained, "you're treating [a] patient prospectively, the Ballard score is basically a retrospective look at how old this baby is. Everything we're doing and acting on is based prospectively on the dating criteria. So the Ballard [Score] really doesn't come into play here." (ECF No. 44-15, PageID.752.)

Third, a Ballard Score is "not exactly specific"—it can be off by "plus or minus or minus several weeks." (ECF No. 54-10, PageID.3117 (Dr. Bedrick); ECF No. 44-25, PageID.1139 (Dr. Fanaroff).) It is meant to be used as an estimate. And, in any event, the hospital staff that gave EK a Ballard Score of 36 weeks also noted his gestational age of 37 weeks and 3 days in the discharge paperwork. (ECF No. 44-11, PageID.621 ("37-3/7 wks GA by dates /36 weeks GA by Ballard").)

Lastly, an ultrasound performed on October 28, 2019, showed that EK was at 13 weeks and 1 day's gestation. (ECF No. 44-2, PageID.265.) Another ultrasound performed on December 23, 2019, showed that EK was at 21 weeks and 0 days' gestation. (*Id*. at PageID.276.) These numbers confirm that by April 13, 2020, EK was at 37 weeks' gestation. Both ultrasound reports were signed by Dr. Danley.

In all, even when viewed in the light most favorable to the government, the undisputed record makes clear that Dr. Danley violated the standard of care in failing to (1) prescribe aspirin to Bowers (2) diagnose Bowers' gestational hypertension and (3) induce Bowers at 37 weeks' gestation.

23

## IV. Causation

That leaves causation. The remaining issue is whether, as a matter of law, Dr. Danley's breaches of the standard of care, i.e., her failures to prescribe aspirin, diagnose Bowers' gestational hypertension and deliver EK at 37 weeks caused Bowers' placental abruption which, in turn, caused EK's HIE and related injuries. Mich. Comp. Law 600.2912a(2). Plaintiff says yes. (ECF No. 44, PageID.214.) While the government does not dispute that the placental abruption caused the HIE (ECF No. 55, PageID.3447), it disputes what caused the placental abruption.

First, the government re-argues that "plaintiffs cannot establish that Bowers had gestational hypertension or preeclampsia" and thus "cannot establish that gestational hypertension or preeclampsia played any role in the placental abruption that injured EK." (ECF No. 55, PageID.3468.) The Court has already addressed this assertion and disagrees—there is no genuine issue of material fact that Bowers suffered gestational hypertension prior to delivering EK.

Second, the government argues that, even assuming Bowers had gestational hypertension, placental abruption could have been caused by a number of other factors including "EK's fetal growth restriction, a placental abnormality, or Bowers' use of tobacco or marijuana during pregnancy," since those factors, says the government, "are equally causes of the abruption in this case." (*Id.*) This fails to create a genuine issue of material fact. For starters, after reviewing the record in the light most favorable to the government, there is insufficient evidence for a reasonable trier of fact to find that Bowers' tobacco or marijuana use caused the placental abruption.

24

Dr. Bedrick, Plaintiffs' neonatology expert, said that he does "not believe use of [tobacco or marijuana] played any role in the development of the abruption." (ECF No. 44-21, PageID.1081–1082.) Dr. Bokor, too, testified that while he thinks smoking marijuana during pregnancy could be "associated" with placental abruption he does not consider it to be an "active risk factor" for placental abruption. (ECF No. 44-15, PageID.716.) Likewise, Dr. Bokor explained that he does not believe tobacco use contributed to the placental abruption in this case. (*Id.* at PageID.755–757.)

And the government's expert, Dr. Fanaroff, agrees that "placental abruption was the sole cause of the child's hypoxic-ischemic process." (*Id.* at PageID.1116.) He also concedes that EK's "neurologic outcome with profound neurodevelopmental devastation, limited ambulation, limited ability to feed . . . etc. is far, far beyond anything that would be potentially due to the risk from marijuana exposure." (*Id.* at PageID.1121.) The government's other expert, Dr. Jones, offered no opinions at all regarding whether tobacco or marijuana caused the placental abruption. (ECF No. 44-17, PageID.1011 (Q. "Based on all of the information and all the medical records that you've been provided today, it is not going to be your opinion at trial that use of marijuana during pregnancy caused or contributed to this child's cerebral palsy spastic quadriplegia, correct? . . . A. Yes.").)

But even assuming that Bowers' tobacco or marijuana use could have been a proximate cause of placental abruption, this Court has no trouble finding that her

gestational hypertension was also a proximate cause.[8] *See O'Neal*, 791 N.W.2d. at 859; *see also* Mich. Model Jury Instructions, Proximate Cause, 15.01 (2010). As mentioned, "[a]n injury may have more than one proximate cause." *Sawyer v. Getachew*, No. 369342, 2025 Mich. App. LEXIS 2275, at *6 (Mich. Ct. App. Mar. 21, 2025) (citing *Benigni v. Alsawah*, 996 N.W.2d. 821, 828 (Mich. 2022)). Here, the medical experts are all in agreement that Dr. Danley's failure to diagnose and treat Bowers' gestational hypertension was a "but-for" cause of EK's injuries. (*See, e.g.*, ECF No. 44-15, PageID.762–763 (Dr. Bokor) ("Q. What is your opinion about the cause of the placental abruption in this case? A: It was the uncontrolled, unmonitored hypertension that was allowed to go past 37 weeks."); (ECF No. 44-17, PageID.995 (Dr. Jones) ("Q. Now, would you agree that in this case preeclampsia and gestational hypertension are causally related to the placental abruption? A. In this particular case, more than likely it was.").)

---

[8] The Court notes that the government may be conflating causation and damages. At one point, the government advises that it is *not* arguing "that EK's [HIE] injuries were caused by Bowers' marijuana or tobacco use or other congenital causes." (ECF No. 55, PageID.3470.) Then later in its brief, the government says that "*for the purposes of damages*" the Court's calculation "must account for the fact that EK would more likely than not have had an underlying neurodevelopmental impairment even if the placental abruption had not occurred and he had not suffered a hypoxic ischemic injury." (*Id.* (emphasis added).) Put differently, the government suggests that even if the placental abruption never happened, the Court should consider whether Bowers' use of tobacco and marijuana during pregnancy may have caused EK to suffer some neurological impairments which would need to be considered in any damages award. The government will certainly have the opportunity to make this argument at trial. But it has no bearing in resolving this motion for partial summary judgment on the question of liability.

Thus, no reasonable fact-finder could disagree that Bowers' untreated gestational hypertension was *a* proximate cause of her placental abruption, even if other causes also contributed.

## V.Conclusion

Accordingly, because there is no genuine issue of material fact regarding breach and causation, Plaintiffs are entitled to summary judgment on the issue of liability. Thus, Plaintiffs' motion for partial summary judgment (ECF No. 44) is GRANTED.

SO ORDERED.

Dated: May 21, 2025

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

27