UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TANISHA BOWERS, et al.,

     Plaintiffs,

v.

UNITED STATES OF AMERICA,

     Defendant.

Case No. 22-10792
Honorable Laurie J. Michelson

---

## OPINION AND ORDER CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW POST-TRIAL

---

This Federal Tort Claim Act/medical malpractice case arises from the injuries sustained by minor Plaintiff E.K. during his birth at a federally funded community health clinic. The Court found, on summary judgment, that a doctor at the clinic was negligent in her prenatal care of E.K.'s mother. (ECF No. 70.) As a result, E.K. suffered a hypoxic injury that caused spastic quadriplegia, hearing and visual impairments, and cognitive deficits. (*Id.*)

In January 2026, the Court conducted an eight-day bench trial on damages. That trial, and the litigation preceding it, presented many difficult questions. But what has never been in doubt throughout the lengthy proceedings is the remarkable love, care, and support provided by E.K.'s devoted parents. Because of their incredible efforts, E.K. will live far longer than his delivering-doctors estimated. But far less than he should, given the Defendant's negligence. Sadly, the Court's primary task

now is to determine E.K.'s life expectancy and the cost of his extensive medical care during that time frame.

To resolve these issues, the Court heard testimony and received documentary evidence from E.K.'s family members, treating providers, and health care, life expectancy, and economic experts. It has carefully considered and weighed that evidence, as well as the parties' extensive findings of fact and conclusions of law.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court finds the following facts to have been proven by a preponderance of the evidence and makes the following conclusions of law.

## I. E.K.'s Medical Condition

E.K. was born in April 2020. He was almost six years old at the time of trial. (Plaintiffs' Exhibit 1, at 3 (4.16.2020 St. John Ascension Neonatal H&P).) Around the time of his birth, E.K. suffered from hypoxic-ischemic encephalopathy (HIE), which is caused by lack of oxygen in the brain. (Sze, ECF No. 99, PageID.6490.) As a result, E.K. has spastic, quadriplegic cerebral palsy with impaired motor control. (Glass, ECF No. 100, PageID.6548–54.) His injuries are permanent. (Sze, ECF No. 99, PageID.6493.)

Plaintiffs—Tanisha Bowers and Brian Kellems, parents to E.K., and Linda Bobrin, a conservator appearing on E.K.'s behalf—presented medical evidence of the HIE brain injury and how it affects E.K.'s function through the testimony of neuroradiology expert, Gordon Sze, M.D., pediatric neurology expert, Stephen T. Glass, M.D., life care planner and physician Roger Huckfeldt, M.D., and E.K.'s

2

treating Physician Assistant Melissa Concepcion and neurologist Dr. Naznin Mahmood. Likely because the Court already found liability at the summary judgment stage, Defendant introduced no medical evidence contradicting the nature and extent of E.K.'s impairments and, indeed, largely does not dispute the nature of E.K.'s injuries.

E.K. has cerebral palsy of the most severe form, or "highest gradation." (Gilbert, ECF No. 102, PageID.7186.) He is unable to sit or stand without assistance and is unable to crawl or walk. (Glass, ECF No. 100, PageID.6551.) He cannot control his bowel or his bladder. (Glass, ECF No. 100, PageID.6551–6652.)

Because of the damage to his brain, E.K. has hearing and vision impairments. In other words, his vision and hearing are limited not because his eyes or ears are themselves damaged, but because his brain cannot effectively process what he sees and hears. (Glass, ECF No. 100, PageID.6548–6549.)

On the Gross Motor Function Classification System, E.K. is classified as Level 5, the most severe level. (Concepcion, ECF No.99, PageID.6520–21.) At the time of trial, he could not consistently and independently lift his head from a supine (lying flat on his back) position. (Mahmood, ECF No. 102, PageID.7184–85.) Nor could he consistently and independently lift his head from a prone (lying flat on his stomach) position. (Mahmood, ECF No. 102, PageID.7185.) Although he can turn his head "from side to side" in a prone position, he cannot lift his head into "cervical extension." (Concepcion, ECF No. 99, PageID.6508, 6523–24.) From a seated position, he can lift his head but "does not maintain it for very long." (Concepcion, ECF No. 99,

PageID.6514, 22.) He cannot yet independently roll from prone to supine or supine to prone, only "minimally to his side." (Mahmood, ECF No. 102, PageID.7185; Concepcion, ECF No. 99, PageID.6524.) E.K. participates in physical and occupational therapies, however, that have significantly improved his gross motor function in recent years. (*See, e.g.*, Bowers, ECF No. 99, PageID.6444–6445, 6446; Concepcion, ECF No. 99, PageID.6506, 6508, 6518.) And Plaintiffs' medical expert, Dr. Huckfeldt, is convinced that E.K. will eventually develop the ability to roll. (ECF No. 100, PageID.6766. ("He will easily roll . . . front to back, back to front, he's almost there now, which is markedly improved.").)

E.K. has no significant fine motor control. (Mahmood, ECF No. 102, PageID.7186.) E.K. also has diminished oral motor control with difficulty swallowing and managing oral secretions. (Glass, ECF No. 100, PageID.6553.) This makes it hard for E.K. to keep an open airway when eating. (Glass, ECF No. 100, PageID.6550.)

Because of the limitations on his ability to eat by mouth, E.K. receives most of his nutrition through a gastronomy feeding tube (g-tube). (Glass, ECF No. 100, PageID.6550, 6674.) He does take some food orally, primarily for sensation and to improve his motor function. (*See* Glass, ECF No. 100, PageID.6592.) But E.K. is likely to need a g-tube for life. (Huckfeldt, ECF No. 100, PageID.6691, 6766.)

E.K. also experiences seizures as a result of damaged nerve cells in his brain that do not fire properly. (Glass, ECF No. 100, PageID.6549.) Initially, E.K. had up to 100 seizures per day. (Bowers, ECF No. 99, PageID.6443, 6446–6447.) But around age three, E.K.'s seizure condition began to improve. (Bowers, ECF No. 99,

PageID.6445.) E.K.'s seizures are now "well controlled" with medications and a ketogenic diet. (Huckfeldt, ECF No. 100, PageID.6765; ECF No. 102, PageID.7186.) Although E.K.'s seizure condition could flare up with illness or during puberty (Mahmood, ECF No. 102, PageID.7193), at the time of trial, he had not had a seizure in more than a year. (Bowers, ECF No. 99, PageID.6447.) But virtually every medical professional who testified at trial agreed that seizures will always be a risk for E.K. (Glass, ECF No. 100, PageID.6646; Huckfeldt, ECF No. 101, PageID.6910; Mahmood, ECF No. 102, PageID.7192; Riddick-Grisham, ECF No. 103, PageID.7325; Concepcion, ECF No. 99, PageID.6511.)

E.K. has also made significant improvements with respect to his risk of aspiration. E.K. can swallow without choking and is better able to manage oral secretions due, in part, to intraoral Botox injections. (Bowers, ECF No. 99, PageID.6446, 6511; Concepcion, ECF No. 99, PageID.6511.) Accordingly, his risk of aspirating is substantially decreased. (Concepcion, ECF No. 99, PageID.6511.) His parents no longer need to "suction" E.K. to remove drool and limit the risk of him aspirating. (Bowers, ECF No. 99, PageID.6450; Huckfeldt, ECF No. 101, PageID.6806–6808.) His respiration has continued to improve. (Bowers, ECF No. 99, PageID.6507.)

With these improvements, E.K. now sleeps through the night. (Bowers, ECF No. 99, PageID.6460, 6496.) But because aspiration and seizures remain risks, E.K.'s parents maintain a baby monitor in his room while he is sleeping. (Bowers, ECF No. 99, PageID.6460.)

5

In sum, E.K. suffered a global HIE injury resulting in spastic quadriplegic cerebral palsy that affected all aspects of his ability to function, including cortical visual impairment, sensorineural hearing loss, seizure disorder, ability to sit, stand, walk, purposefully move his body and limbs, feed by mouth, communicate, understand, and make his needs and desires known, as well as developmental and cognitive impairments. While E.K.'s condition has improved significantly in the last few years, the parties do not dispute that E.K. will never be able to care for himself or live independently. (*See, e.g.*, Riddick-Grisham, ECF No. 103, PageID.7303; Huckfeldt, ECF No. 100, PageID.6732.)

## II. E.K.'s Lifetime Care Needs

Given E.K.'s severe impairments, the Court turns next to what kind of care and assistance E.K. requires to manage his significant medical needs for the remainder of his life.

It is undisputed that the purpose and goal of a life care plan is to provide a patient with the resources needed to keep him healthy and safe, maximize his functional abilities, maintain his well-being in the least restrictive environment possible, and provide him with a good quality of life. (*See* Riddick-Grisham, ECF No. 103, PageID.7295–7297; Huckfeldt, ECF No. 100, PageID.6671–6672.).

Plaintiffs offered a life care plan prepared by physician and experienced life care planner, Roger Huckfeldt, M.D. (Plaintiffs' Exhibit 27 (Huckfeldt Life Care Plan).) Glass endorsed Huckfeldt's life care plan. (Glass, ECF No. 100, PageID.6632.) The government did not present an opposing life care plan, but provided the opinion

of Susan Riddick-Grisham, a nurse life care planner, to critique the methodology used by Huckfeldt. (Riddick-Grisham, ECF No. 103, PageID.7290.)

The Court finds that Huckfeldt's comprehensive life care plan was developed using standard life care planning methodologies. For the most part, his plan reasonably provides for E.K.'s necessary therapies, surgeries, procedures, diagnostic labs, medications, durable medical equipment, orthotics and supplies, home modifications, and transportation costs. There are, however, some aspects of the home care services—far and away the largest category of the total costs sought in the life care plan—that the Court finds excessive.

### A. 24-Hour Nursing Care

As mentioned, there is no dispute that E.K. will never be independent or be able to care for himself. (Riddick-Grisham, ECF No. 103, PageID.7303; Huckfeldt, ECF No. 100, PageID.6732.) But the parties do contest the degree of support E.K. requires to manage his needs on a day-to-day basis.

Start with the life care plan's provision of 24-hour nursing care. The government argues this is not necessary given E.K.'s greatly reduced seizures and aspiration risk. Plaintiffs counter that *reduced* health risks are not *eliminated* health risks, and as such, E.K. will need some kind of 24/7 skilled nursing care for the rest of his life. (Huckfeldt, ECF No. 100, PageID.6731; Glass, ECF No. 100, PageID.6554–6556.) The Court agrees with Plaintiffs.

Despite E.K.'s improvements in the last few years, every doctor who testified in the case essentially agreed that E.K.'s future medical needs are somewhat

unpredictable because he is always at risk. Glass testified, for instance, that E.K. requires "careful attention" to keep his airway clear, including at night. (Glass, ECF No. 100, PageID.6555–6657 ("the airway that we're talking about is something that needs to be protected 24 hours a day. And that support is required conventionally 24 hours a day.").) The risks E.K. faces are compounded, Glass says, by E.K.'s inability to vocalize his own needs. (Glass, ECF No. 100, PageID.6651.) Accordingly, Glass testified that E.K. requires close supervision by "observers that are close to E.K. and know his means of functioning," such that they can identify changes in his status and identify illnesses. (Glass, ECF No. 100, PageID.6651.)

E.K.'s treating neurologist, Mahmood, said much the same. She testified that E.K. is very fragile, and despite taking four medications to control his seizures, E.K. remains at risk for future seizures, especially when he falls ill or when he reaches puberty. (Mahmood, ECF No. 102, PageID.7193.) Mahmood also testified that E.K. remains at risk for choking and aspiration, which can lead to pneumonia and ultimately death if not recognized and treated in time. (Mahmood, ECF No. 102, PageID.7200.) Mahmood testified that when E.K. has a breakthrough seizure, he must receive rescue medications, and if those medications are not timely administered, E.K. could die. (Mahmood, ECF No. 102, PageID.7193–7194.) For these reasons, E.K. must be monitored very carefully. (Mahmood, ECF No. 102, PageID.7194.)

Huckfeldt, too, described the continued risks E.K. faces. Huckfeldt testified if E.K. has a seizure or needs suction in the middle of the night, there must be someone

"immediately available" to intervene or "the risk goes up dramatically." (Huckfeldt, ECF No. 100, PageID.6734.) And if E.K.'s parents are asleep upstairs, they are not "immediately available" to assist in the case of emergency as Huckfeldt believes would be necessary. (Huckfeldt, ECF No. 100, PageID.6734.) Even when E.K.'s parents are home and awake, they cannot leave him unattended for more than a few minutes, or risk missing a seizure or aspiration emergency. (*See* Huckfeldt, ECF No. 100, PageID.6736.) For these reasons, the Court agrees with Plaintiffs that E.K. requires a medical professional to provide 24-hour attention and care.

Importantly, while all agree that E.K.'s devoted parents have done an excellent job providing care to their young son, the testifying medical providers also agree that an individual with medical training—like a nurse—would be the most appropriate provider of E.K.'s home care as he continues to age. (Glass, ECF No. 100, PageID.6555–6557 (noting that although E.K.'s parents have remarkably managed his care thus far, "as the child gets older, their needs get more complex"); Huckfeldt, ECF No. 100, PageID.6732–6733, 6746 (explaining why E.K.'s complex medical needs require care by a skilled medical professional, like an LPN[1]); Riddick-Grisham, ECF No. 103, PageID.7328 (explaining than an LPN is required to administer medications, manage medical equipment such as suctioning, g-tube feeding, assessing physical

---

[1] A licensed practical nurse, or LPN, is a medical professional with more training than a patient care attendant but less than a registered nurse. (Huckfeldt, ECF No. 100, PageID.6732.) Unlike a care attendant, an LPN can exercise medical decision-making, albeit with oversight. (*Id.*)

condition, and responding to medical emergencies); Mahmood, ECF No. 102, PageID.7196–7197.).)

The government argues that to the extent E.K. requires round-the-clock care, he already has access to resources that can meet those needs. Namely, his parents can attend to him overnight through the use of a baby monitor, and several hours of E.K.'s daytime-care could be met by attending school.

But as described above, the testimony provided by Glass, Huckfeldt, and Mahmood established that E.K. remains at constant risk for an aspiration event or breakthrough seizure—and these medical emergencies are among the most common causes of death for children like E.K. (*See* Huckfeldt, ECF No. 101, PageID.6882–6883.) And his parents' current use of a baby monitor to supervise E.K. at night is not an adequate substitute for professional medical care, for several reasons. First, E.K.'s parents may not be around forever. Second, E.K. cannot verbally communicate his distress, so it is possible a medical emergency could be soundless and go unnoticed by his parents. Third, the Court agrees with Huckfeldt that even the most devoted parents, half-asleep in the middle of the night, with no medical training, would be ill-equipped to provide the kind of urgent, life-saving care E.K. may need in a crisis. (Huckfeldt, ECF No. 101, PageID.6908.) Lastly, the Court also agrees with Huckfeldt that, for some portion of the day, parents of children with such significant needs are entitled to time off to "just be mom and dad." Indeed, even the government's expert, Riddick-Grisham, acknowledged that E.K.'s parents should not be responsible for extraordinary care. (Riddick-Grisham, ECF No. 103, PageID.7339, 7340–7341.) As

10

another court grappling with similar issues aptly put it, "The effort, skill, and love that [minor plaintiff's mother] has put into the care of [minor plaintiff] is both commendable and heartbreaking . . . . [but that] level of care . . . is not sustainable by one highly dedicated person with some limited assistance." *Roeman v. United States*, No. 19-4006, 2025 U.S. Dist. LEXIS 56276, at *75 (D. S.D. Mar. 25, 2025).

Nor does the record establish that E.K. can and will receive adequate daytime nursing care at school. Although E.K.'s mother, Huckfeldt, and Glass all testified that school would be beneficial for E.K. (Bowers, ECF No. 99, PageID.6457; Glass, ECF No. 100, PageID.6576), the record established that only a handful of schools can provide the one-on-one nursing care E.K. needs. (Huckfeldt, ECF No. 100, PageID.6733–6734 ("I have never yet seen a public school, public or private, that has one-on-one nursing for the child. Well, that's what E.K. needs.").) Courtney Sanders, assistant principal of Moses Field School—one of only two Detroit public schools devoted solely to students with disabilities—corroborated that point. She testified that a child like E.K. would only receive one-on-one nursing care if his individualized education plan (IEP) required it.[2] (Sanders, ECF No. 104, PageID.7527, 7535–7536,

---

[2] E.K.'s mother, Tanisha Bowers, also testified that recent allegations of abuse toward children at Moses Field School made her unwilling to send E.K. there. (ECF No. 99, PageID.6456–6457.) So even if the school could provide one-on-one nursing, or if E.K.'s IEP prescribed it—both of which remain uncertain—Bowers would not send E.K. there. Bowers identified another school—Wing Lake Development—that she thinks could be a good fit for E.K., but that school is out of district, requiring special approval before E.K. could enroll. (Bowers, ECF No. 99, PageID.6457–6458; Riddick-Grisham, ECF No. 103, PageID.7255–7256.) All to say, E.K.'s school options are limited and come with challenges, which is all the more reason why a 24-hour LPN is appropriate.

7546–7547.) But whether E.K. would receive such an IEP order is uncertain. (*See* Riddick-Grisham, ECF No. 103, PageID.7316.)

In sum, given the risks that E.K. faces, the Court finds that he requires 24/7 LPN care to meet his medical needs, ensure his safety, prevent illness and complications, respond to emergencies, and be proactive as warranted, especially since E.K. cannot ask or vocalize his need for help. This includes throughout the night when, according to Plaintiffs' treating physicians and experts, E.K. remains at risk for seizures, choking, and aspiration. And this also includes during school hours, because the record did not establish by a preponderance of the evidence that there is an available school able to meet E.K.'s sensitive needs.

Another benefit of 24-hour LPN care is that the nurse can provide some additional home-making services in addition to tending to E.K.'s medical needs. This, in turn, reduces some of the costs in Huckfeldt's life care plan. More on that later. An LPN, for example, can help with scheduling medical appointments, doing laundry, taking E.K. to places outside the home, light cleaning, and food preparation. (Huckfeldt, ECF No. 101, PageID.6833; Riddick-Grisham ECF No. 103, PageID.7264, 7268, 7283, 7353–54.)

Having determined that E.K. requires extensive nursing care, the Court must also determine the appropriate type of LPN: agency-pay or private-pay. The rate of the former is higher because the agency screens and hires the candidates and provides immediate substitutes or replacements as needed. (Huckfeldt, ECF No. 100, PageID.6737.) Because these are beneficial services to the family, Huckfeldt and

12

Riddick-Grisham both agreed that hiring an agency nurse rather than private pay nurse is reasonable. (Huckfeldt, ECF No. 100, PageID.6737; Riddick-Grisham, ECF 103, PageID.7332.) The Court agrees. And that rate, as provided by Huckfeldt (and undisputed by Riddick-Grisham), is $66.19 per hour. (Plaintiffs' Exhibit 27 (Huckfeldt Life Care Plan); *see also* Riddick-Grisham, ECF No. 103, PageID.7335.)

Accordingly, the Court finds that 24/7 LPN care is reasonable and warranted to protect the health, wellbeing, and safety of E.K. at the agency rate of $66.19 per hour.

## B. Additional Professionals

In addition to 24/7 LPN care, Huckfeldt's life care plan recommended the help of various other professionals to bolster E.K.'s home medical care, tend to E.K.'s non-medical needs, and generally support his wellbeing. The Court finds that some, but not all, of these services are reasonably necessary.

### 1. Personal Assistant

First, the Court accepts Huckfeldt's recommendation that E.K. be supported by a personal assistant. (Huckfeldt, ECF No. 100, PageID.6739–6748.) This assistant, opined Huckfeldt, would be needed 28 hours a week (or four hours a day) starting in November 2030, to assist with lifting and bathing E.K. as he grows. E.K. is already 38 pounds. And between 35 and 40 pounds is the standard cut-off point for safe, unassisted, one-person lifts. (Huckfeldt, ECF No. 100, PageID.6696.) Additionally, while it is undisputed that the LPN can assist with "light clean up" and some errands (Riddick-Grisham, ECF No. 103, PageID.7268), the personal assistant will help with

13

the more substantial home care tasks that E.K. cannot perform himself, or that the LPN—primarily tasked with attending E.K.'s medical needs—might not do with regularity. That includes all forms of shopping and putting items away, managing E.K.'s mail and bills, deep cleaning and more burdensome chores, and all other types of home care tasks "that the nurse is not going to be able to do by herself without leaving [E.K.] alone too often." (Huckfeldt, ECF No. 100, PageID.6739–6740.) Even Riddick-Grisham could not really dispute that the personal assistant would perform necessary errands for E.K. (Riddick-Grisham, ECF No. 103, PageID.7268.)

To be sure, there may be some occasional overlap between the light domestic work the LPN might provide and the personal assistant's day-to-day work. But managing E.K.'s household will undoubtedly be more complex than managing the home of an independent adult without such significant needs. There are more bills, more equipment, more appointments, more transportation, and more challenges to navigate. And given E.K.'s medical risks, E.K. cannot be left unattended for more than a few minutes, necessarily limiting the LPN's ability to help with more time-consuming chores. (*See* Huckfeldt, ECF No. 100, PageID.6735–6736.) So the Court agrees with Huckfeldt that a personal assistant is reasonably necessary to manage the day-to-day *domestic* tasks E.K. will need assistance with, while the LPN will focus primarily on E.K.'s *medical* needs. Using Genworth, a cost resource that life care planners typically use, the reasonable hourly rate for a personal assistant is $34.00 per hour. (*See* Plaintiffs' Exhibit 27, p. 38 (Huckfeldt Life Care Plan); *see also* Huckfeldt, ECF No.100, PageID.6745–6746.)

## 2. Homemaker and Facility Maintenance Services

Because an LPN and personal assistant can perform much of E.K.'s day-to-day support tasks, the Court next evaluates the need to provide E.K. with homemaker services for 12 hours per week and facility maintenance services for 8 hours per week. (ECF No. 103, PageID.7269.) Riddick-Grisham credibly testified that in her many years of experience she had "never seen" the level of home and facility care recommended in Huckfeldt's life care plan. (Riddick-Grisham, ECF No. 103, PageID.7269.) In her experience, the "LPN caregiver should be doing most of the general clean up," rendering several hours of homemaking and facility care (on top of the personal assistant), redundant. (*See* Riddick-Grisham, ECF No. 103, PageID.7268.) So 20 hours a week of homemaking and facility maintenance care would be, in her view, "excessive." (Riddick-Grisham, ECF No. 103, PageID.7268.) The Court agrees.

For the reasons already explained, a personal assistant primarily focused on managing E.K.'s household and non-medical needs will be sufficient to ensure E.K.'s house is well maintained, in addition to supplemental help from E.K.'s 24-hour nurse and, of course, his parents.

## 3. Care Manager

Similarly, in light of the other care providers approved in the plan, the Court finds it is not reasonably necessary to add case management/care management services for four hours per week. Riddick-Grisham, a former care manager herself, explained that a care manager is, essentially, a liaison between the family and the

patient's medical team, and one who monitors any changes in the patient's condition. (*See* Riddick-Grisham, ECF No. 103, PageID.7277; *see also* Huckfeldt, ECF No. 100, PageID.6755 (describing the care manager as "E.K.'s medical advocate to consult with doctors in planning his care.").) Accordingly, the care manager occasionally "check[s] in with parents" and caregivers to see if there are any new clinical problems, medications, or care issues that should be raised with the patient's medical providers. (Riddick-Grisham, ECF No. 103, PageID.7277.) Huckfeldt and Riddick-Grisham disagree as to whether the care manager would also "budget and manage bills" (Huckfeldt, ECF No. 100, PageID.6755; Riddick-Grisham, ECF No. 103, PageID.7282–7283.)

Sometimes the work of a care manager can be "labor intensive," other times, less so, but generally the hours "even out." (Riddick-Grisham, ECF No. 103, PageID.7276–7277.) So Riddick-Grisham, who has served as a care manager for children with needs like E.K.'s, typically includes "12 to 18 or 12 to 20 hours" of care management a year and has found that this number of hours is "plenty." (Riddick-Grisham, ECF No. 103, PageID.7276–7277.) In her view, the 4 hours of care management a week provided by the Huckfeldt plan is excessive. (*See* Riddick-Grisham, ECF No. 103, PageID.7219, 7276–7277.)

Huckfeldt testified that a care manager was necessary to supervise the LPNs providing 24-hour care, who are not licensed to "make judgments about the care they're providing," and therefore need "oversight." (Huckfeldt, ECF No. 100, PageID.6747.) But this "oversight" can be accomplished by the LPN's agency, by

16

consultation with E.K.'s doctors when needed, and by some occasional check-ins with a care manager, as described by Riddick-Grisham. (*See* Riddick-Grisham, ECF No. 103, PageID.7277.) And E.K., again, has supportive parents, who are deeply involved in and familiar with his care, and who can raise alarm bells with E.K.'s medical team should issues arise.

Based on Riddick-Grisham's personal experience working as a care manager, the Court credits her testimony over Huckfeldt on this issue and, in turn, reduces the number of care manager hours provided by Huckfeldt's life care plan from 208 hours to 20 hours a year until April 16, 2038. That number will increase to 52 hours a year when E.K. turns 18 to compensate for the fact that E.K.'s parents ought not to be wholly responsible for day-to-day management of his care when he becomes an adult.

\*          \*          \*

Ultimately, Huckfeldt's lifecare plan is comprehensive and reliable. But in some respects, it provides for more care than necessary. The Court is persuaded by Riddick-Grisham's testimony that a home maker and facilities maintenance worker are not reasonably necessary components of a robust life care plan to maintain E.K.'s health and quality of living. Nor are the requested hours of case management needed. So the Court will exclude the homemaker and facility's line items from the total plan and reduce the care manager's hours as described above.

Given these findings of fact the Court will direct Plaintiffs to submit an amended life care plan reflecting the above changes (i.e., excision of homemaker and

17

facility maintenance services, and reductions in care manager hours) within 30 days of entry of this order.

### III. E.K.'s Life Expectancy

The next issue is how many years E.K. will need the care provided in the amended life care plan. That requires a determination of E.K.'s life expectancy. The parties provided competing life expectancies. Plaintiffs presented their theory through life expectancy experts Huckfeldt and Glass, while the government presented its theory through life expectancy expert Robert Shavelle, Ph.D.

Both sides' experts endorsed an approach to estimating life expectancy that begins with statistics. (Glass, ECF No. 100, PageID.6643; Huckfeldt, ECF No. 100, PageID.6764–6765; Shavelle, ECF No. 104, PageID.7384.) The experts all relied (to varying extents) on "the California data"—a group of studies prepared by the Life Expectancy Project at UCLA, a research group of statisticians, not clinicians, that Shavelle leads as its Technical Director. (Glass, ECF No. 100, PageID.6763–6765; Huckfeldt, ECF No. 100, PageID.6764; Shavelle, 104, PageID.7391–7393.) The group publishes, among other things, statistical tables that estimate the average life expectancy of individuals with cerebral palsy based, in large measure, on their gross motor and feeding skills. *See, e.g.*, Jordan C. Brooks, David J. Strauss, Robert M. Shavelle, Linh M. Tran, Lewis Rosenbloom, & Yvonne W. Wu, *Recent Trends in Cerebral Palsy Survival. Part II: Individual Survival Prognosis*, J. Developmental Med. & Child Neurology (2014) (hereinafter "Brooks 2014" or "2014 study").

In their testimony, the life expectancy experts all agreed that these tables may provide a useful starting point for estimating E.K.'s life expectancy. (Glass, ECF No. 100, PageID.6644; Huckfeldt, ECF No. 100, PageID.6764 ("I start with the California data"); Shavelle, ECF No. 104, PageID.7452.) These experts disagree, however, about which "category" E.K. should be grouped in, and whether a physician can adjust a patient's statistically predicted life expectancy based on his or her clinical assessment and conclusions about the patient's prognosis. (Glass, ECF No. 100, PageID.6600–6601; Glass, ECF No. 100, PageID.6643–6653; Huckfeldt, ECF No. 100, PageID.6765–6766; Huckfeldt, ECF No. 101, PageID.6877–6882; Shavelle, ECF No. 104, PageID.7414–7415, 7420–7421.)

This relatively complicated debate can be simplified as follows: at present, six-year-old E.K. does not have the ability to feed himself or lift his head and chest from the prone position "independently, consistently, and purposely." (Shavelle, ECF No. 104, PageID.7479, 7497–7498.) Thus, Shavelle would place E.K. in the "cannot lift head" and "tube fed" categories of patients included in the Life Expectancy Project's various studies. (Shavelle, ECF No. 104, PageID.7420–7421.) Applying those classifications based on E.K.'s current conditions, Shavelle opines that E.K. has a life expectancy of 18 years beyond the date of trial. (Shavelle, ECF No. 104, PageID.7420.) In other words, Shavelle opines that E.K.'s life expectancy is 24 years.

Huckfeldt, on the other hand, says that although E.K. has a feeding tube, his ability to take some food by mouth and his improved airway protection mitigate the health risks typically associated with being tube fed. (*See* Huckfeldt, ECF No. 101,

PageID.6902.) So using the same statistical data from the Life Expectancy Project studies, Huckfeldt felt it more accurate to place E.K. somewhere in between the "tube fed" and "fed orally by others" categories, notwithstanding his reliance on a g-tube. (Huckfeldt, ECF No. 101, PageID.6867, 6877–6878.)

Just as significant, Huckfeldt placed E.K. in the "rolls" category of gross motor function, based on his professional opinion that E.K. will "one hundred percent" be able to roll over in the coming years—present abilities aside. (Huckfeldt, ECF No. 101, PageID.6869.) So by reference to Table III of the 2014 Brooks study (below), which estimates life expectancy for children with cerebral palsy who reach at least age 15, Huckfeldt concludes that by age 15 E.K. will be firmly within the "rolls/sits" and "fed by others (FBO)" categories. (Huckfeldt, ECF No. 100, PageID.6888–6890.) From this, he opines that E.K.'s approximate life expectancy is 50 years. (Huckfeldt, ECF No. 100, PageID.6888–6890.)[3]

---

[3] Glass, relying primarily on his own anecdotal experience, arrived at the same life expectancy estimate as Huckfeldt—50 years. (Glass, ECF No. 100, PageID.6558.) Because the parties focused primarily on the competing opinions offered by Huckfeldt and Shavelle, the Court does the same.

**Table III:** Life expectancy: additional years (standard error) for adolescents and adults with cerebral palsy[a]

| Sex/Age | Cannot lift head | | | Lifts head or chest | | | Rolls/sits | | | Walks unaided[b] | General population |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | TF | FBO | SF | TF | FBO | SF | TF | FBO | SF | | |
| **Female** | | | | | | | | | | | |
| 15y | 14 (1.0) | 18 (1.2) | – | 18 (1.5) | 23 (1.0) | – | 27 (1.8) | 37 (1.3) | 48 (1.2) | 55 (1.0) | 66.2 |
| 30y | 14 (0.9) | 19 (1.2) | – | 14 (0.8) | 23 (1.1) | – | 18 (1.8) | 32 (1.2) | 37 (0.8) | 43 (0.7) | 51.6 |
| 45y | 12 (1.0) | 14 (1.0) | – | 12 (1.0) | 17 (1.2) | – | 12 (1.5) | 21 (1.0) | 25 (0.6) | 29 (0.6) | 37.4 |
| 60y | 7 (0.8) | 10 (1.4) | – | 7 (0.8) | 10 (1.1) | – | 7 (0.8) | 10 (0.8) | 16 (0.5) | 19 (0.7) | 24.1 |
| **Male** | | | | | | | | | | | |
| 15y | 14 (1.0) | 18 (1.2) | – | 18 (1.4) | 23 (1.0) | – | 27 (1.7) | 33 (1.1) | 45 (1.1) | 52 (0.9) | 61.4 |
| 30y | 14 (0.9) | 19 (1.2) | – | 14 (0.8) | 23 (1.1) | – | 18 (1.7) | 28 (1.1) | 33 (0.7) | 39 (0.6) | 47.4 |
| 45y | 12 (1.0) | 14 (1.0) | – | 12 (1.0) | 17 (1.1) | – | 12 (1.5) | 18 (0.9) | 22 (0.5) | 25 (0.5) | 33.5 |
| 60y | 7 (0.8) | 10 (1.4) | – | 7 (0.8) | 10 (1.1) | – | 7 (0.8) | 10 (0.8) | 12 (0.4) | 15 (0.5) | 21.1 |

–, Results not shown because of small sample size. [a]As noted in the text, these life expectancies do not necessarily apply to younger children. [b]Life expectancies for the 'walks unaided' groups assume that individuals in the group will remain ambulatory until at least age 60. FBO, fed orally by others; SF, self-feeds orally; TF, tube fed.

*Source:* Brooks 2014

To further explain, Table III above indicates that an adolescent male with cerebral palsy who lives to 15 years old (the vertical column on the far left) and who can roll/sit but is fed by others (the horizontal section on the right) is expected to live an additional 33 years—i.e., to age 48.

How, exactly, Huckfeldt then got to age 50 is a little more complicated. As Huckfeldt explained, the 15-year-old category appearing on this table includes data for a cohort of individuals who were within a 5-year range of 15. So, because "15y" actually represents a cohort of ages spanning 5 years, Huckfeldt placed E.K. within the middle of that range and added two extra years since some people captured within the age 15 category may actually be older than 15 (and thus live past 48 when 33 years are added). (Huckfeldt, ECF No. 101, PageID.6887–6891.)

Shavelle critiques Huckfeldt's approach in a few ways. For one, he says that starting E.K. at age 15 in Table III (above) in the Brooks 2014 study is statistically improper, because no one, including E.K., is guaranteed to live to tomorrow, let alone

several more years. (Shavelle, ECF No. 104, PageID.7416, 7244.) For another, he critiques the categories of motor and feeding skills that Huckfeldt placed E.K. in. Again, Shavelle believes that under the parameters of the Brooks study, a child like E.K., who gets the majority of his nutrition through a feeding tube, even though he can take some food orally, should be placed in the "tube fed" category. (Shavelle, ECF No. 104, PageID.7423, 7475.) And because E.K. cannot currently lift his head from the prone position, (*see, e.g.,* Concepcion, ECF No. 99, PageID.6508; Glass, ECF No. 100, PageID.6573–6574), nor can he roll from back to prone (Concepcion, ECF No. 99, PageID.6524), Shavelle says E.K. cannot be placed in the "rolls" category.

In the end, the Court agrees with portions of Shavelle's approach and portions of Huckfeldt's approach. First, as to age. While both sides' experts agree that E.K. has a greater than 50% chance of living to be 15 years old, the Court recognizes that as a matter of statistical analysis, Huckfeldt's assumption that E.K. *will* live to 15— even if more likely than not—improperly inflates E.K.'s life expectancy. So the Court agrees with Shavelle that the correct starting point for the analysis is to place E.K. in a cohort category closer to his current age.

Second, as to motor skills. It is undisputed that E.K. will likely need a feeding tube for the rest of his life, (*see* Glass, ECF No. 100, PageID.6550; Huckfeldt, ECF No. 101, PageID.6824, 6691, 6766, 6902; Shavelle, ECF No. 104, PageID.7504), and he takes only some food that is fed by others. So he is more properly placed in the "tube fed" category.

Third, as to mobility. Shavelle and Huckfeldt diverge on whether E.K. will likely roll in the future. (*Compare* Shavelle, ECF No. 104, PageID.7403–7404, 7412, with Huckfeldt, *supra*.) Huckfeldt, based on his clinical observations of E.K., strongly endorsed placing E.K. in the category of children who "roll," based on the above-average progress E.K. has made in the last few years.

Huckfeldt is the physician. As Plaintiffs point out, the Life Expectancy Project's own publications suggest that physician input is important for providing a more comprehensive picture of an individual's life expectancy:

> When empirical estimates of mortality rates are not available, the qualitative assessment of an experienced clinician often proves helpful in understanding whether certain comorbidities (e.g. scoliosis, hydrocephalus, frequency of infection) and general health are better or worse than that of the average child with an otherwise similar pattern of disabilities. Thus Tables II and III provide a starting point for a more comprehensive analysis of survival prognosis that considers more than just motor and feeding skills. The question of interest in practical work is not whether an individual's gross motor or feeding skills narrowly qualifies for a particular group in Table II or III, but whether that individual's condition as a whole is typical of the group. This is particularly important in cases where an individual's pattern of disability does not fit neatly into one of the motor-feeding categories presented there. If the person's profile with respect to these and other predictive factors is markedly better or worse than the average then some further adjustment to the survival prognosis may be indicated.

Brooks 2014, 6.

Here, both Huckfeldt and Glass, physicians with years of experience treating patients like E.K. and who personally evaluated E.K., unlike Shavelle, testified that E.K. has shown marked improvements in various areas of functioning that make his circumstances better than average. (Glass, ECF No. 100, PageID.6620, 6628, 6648; Huckfeldt, ECF No, 100, PageID.6764–6767.) His seizures have improved

"remarkabl[y]." (ECF No. 100, PageID.6549.) E.K.'s doctors testified that he is at a relatively low risk of the respiratory complications, such as aspiration or pneumonia, that tend to reduce the life-expectancy for those classified as "tube fed." (Huckfeldt, ECF No. 100, PageID.6765–6766; Glass, ECF No. 100, PageID.6634.) And again, all of this made Huckfeldt confident that E.K. will develop the ability to roll, which improves his prognosis significantly.

Additionally, the trial record also established that E.K. is receiving and will continue to receive exceptional medical treatment that has helped to improve his condition. (*See, e.g.,* Glass, ECF No. 100, PageID.6625–6627.) This is not captured by looking at just the life expectancy study statistics. (Glass, ECF No. 100, PageID.6626.) The Court finds that these additional factors—the quality of E.K.'s medical care, his marked improvements, and the personal observations of experienced physicians, should be considered in determining E.K.'s life expectancy.

In sum, the Court concludes that E.K.'s life expectancy should be determined by placing him in the most appropriate position on Table III of the Brooks 2014 study (above). This means starting him at age 4, and not 15; recognizing that he is mainly tube-fed and fed some by others; and crediting the evaluating physicians that he will roll considering his improvements over time.

In response to questioning by the Court, Shavelle testified that if Table III started in the left-hand column with a male "4 yr" age (rather than starting at "15 yr" age), and E.K. was placed in the "tube fed" and "partially rolls" categories, E.K. would have a life expectancy of approximately 32 additional years. In other words, using the

24

data from the Brooks study, the Court finds by a preponderance of the evidence that E.K.'s life expectancy is 36 years old. (*See* Shavelle, ECF No. 104, PageID.7522–7523.)

## IV. Present Value of Future Medical Expenses

To calculate the present value of E.K.'s future medical expenses, it is necessary to determine the rate at which those expenses will increase in future years. The parties presented competing economic expert testimony to determine this calculation. And although the experts reached different conclusions about the applicable interest rates, they largely agreed on the general methodology for calculating present value. (Paranjpe, ECF No. 101, PageID.6946–6948; Gilbert, ECF No. 102, PageID.7058–7060.)

To calculate the growth rates for future medical expenses, economists start with a professional forecast of the growth rate for consumer prices in general. (Gilbert, ECF No. 102, PageID.7059; Paranjpe, ECF No. 101, PageID.6947–6948.) From that forecasted general rate, economists add or subtract a certain percentage when data shows that a particular category of expenses has historically grown faster or slower than the general inflation rate. (Gilbert, ECF No. 102, PageID.7059; Paranjpe, ECF No. 101, PageID.6948) Then, economists apply the appropriate growth rate to each expense category for a certain number of years. (Gilbert, ECF No. 102, PageID.7062; *see* Paranjpe, ECF No. 101, PageID.6962.) Finally, economists will reduce those future costs to present value by using an appropriate discount rate. (Gilbert, ECF No. 102, PageID.7063; Paranjpe, ECF No. 101, PageID.6965.) In Michigan, that discount rate is statutorily mandated at 5%. Mich. Comp. Laws § 600.6306(2).

The two competing economists, Drs. Paranjpe and Gilbert diverged at step two. (Gilbert, ECF No. 102, PageID.7090–7081.) Paranjpe looked to historical inflation rates dating back to 1935 to calculate three broad categories of costs and their respective growth rates: a 4.5% growth rate for the cost of medical care and services, a 4% growth rate for commodities, and a 3% growth rate for "general inflation." (Paranjpe, ECF No. 101, PageID.6953–6954, 6956.)

Gilbert took a more nuanced approach. He looked at a narrower pool of historical interest rates to exclude historic anomalies—for example, the exceptional inflation rates during the 1980s. (Gilbert, ECF No. 102, PageID.7088.) And Gilbert calculated a specialized interest rate for each category of care in E.K.'s life care plan. He criticized Paranjpe's three big bucket approach (services, commodities, and general inflation) as grouping too many types of goods and services together. (Gilbert, ECF No. 102, PageID.7092, 7099–7105.)

In terms of methodology, the Court finds Gilbert's approach to forecasting interest rates to be more credible than that of Paranjpe. In terms of executing that methodology, however, Paranjpe identified several mathematical errors in Gilbert's initial expert report that give the Court pause. (ECF No. 101, PageID.6973–6978.) Gilbert, to his credit, owned up to these errors while testifying and conceded that he neglected to double check his math. (Gilbert, ECF No. 102, PageID.7065–7067.) The Court understands that calculation errors may occur in doing a complicated analysis that involves many different categories of care, inflation rates, and spreadsheet

26

formulas. (Gilbert, ECF No. 102, PageID.7151.) But the multiple errors in Gilbert's report rendered it too unreliable to accept whole cloth.

Accordingly, the Court directs the government to submit a supplemental brief outlining the present value of E.K.'s life care plan, as amended by this order, using the inflation rates calculated by Gilbert. This supplemental filing shall be submitted within 30 days of Plaintiff submitting the amended life care plan. Plaintiffs shall have 14 days to respond with any mathematical errors therein. In other words, this is not an opportunity to re-argue the validity of Gilbert's estimated rates.

*     *     *

In sum, the Court adopts Huckfeldt's life care plan with home maker and facility maintenance services excised, and care manager services reduced. The life care plan and its total cost is to be reduced to reflect the Court's determined life expectancy of 36 years.

An amended life care plan reflecting these changes shall be submitted within **30 days** of entry of this order.

The government shall then have **30 days** from service of that supplemental filing to provide an updated calculation of the plan's present value, applying Gilbert's methodology and interest rates.

Finally, Plaintiffs shall have **14 days** from service of that supplemental report to review it for accuracy and identify any errors. Should Plaintiffs find any such errors, they shall notify the Court and the Court will conduct a telephonic status conference with the parties to resolve any outstanding issues.

## V. Conclusions of Law

From these findings of fact, the Court further finds that, based on the relevant law, Plaintiffs proved by a preponderance of the evidence the damages to which E.K. is entitled as a result of the Defendant's negligence. (ECF No. 70.)

Start with economic damages. Michigan law governs this dispute. *Huddleston v. United States*, 485 F. App'x 744, 745 (6th Cir. 2012) ("Courts applying the FTCA look to the substantive tort law of the state in which the cause of action arose to determine liability and damages." (citation omitted)). Under the FTCA, the United States is liable "in the same manner and in the same extent as a private individual under like circumstances. . . ." 28 U.S.C. § 2674.

Plaintiffs are entitled to damages that fully compensate for their injuries and make them whole. *Unibar Maintenance Servs, Inc. v. Saigh*, 283 Mich. App. 609, 769 (Mich. 2009). Under Michigan law, "economic loss" includes all

> objectively verifiable pecuniary damages arising from medical expenses or medical care, rehabilitation services, custodial care, loss of wages, loss of future earnings, burial costs, loss of use of property, costs of repair or replacement of property, loss of future earnings, burial costs, loss of use of property, costs or repair or replacement of property, costs of obtaining substitute domestic services, loss of employment or other objectively verifiable monetary losses.

Mich. Comp. Laws § 600.2945(c).

To recover medical expenses, the plaintiff must establish the reasonable value of medical care. *Herter v. City of Detroit*, 245 Mich. 425, 428 (1929). And plaintiffs can recover only "if they can prove that their loss will occur to a reasonable degree of

certainty as a result of the injury suffered." *Johnson v. Henry Ford Hosp.*, No. 250874/251542, 2005 WL 658820, at *7 (Mich. Ct. App. Mar. 22, 2005).

> As the Michigan Supreme Court explained,
>
> an injured person is entitled to recover damages for the reasonable medical, hospital or nursing services, whether they are rendered to him gratuitously or paid by his employer. Such service or such payment is for the benefit of the injured person. It is a gift to him. But since it is one of the elements of injury, he is entitled to recover the reasonable value of the service.

*Bunda v. Hardwick*, 138 N.W.2d 305, 311 (Mich. 1965) (citation omitted). The Court's findings of fact set forth E.K.'s reasonable economic damages.

The Court also finds that the government failed to establish that Plaintiffs are not entitled to recover E.K.'s past medical damages. There is nothing in the record to suggest that the government has already paid, or should not have to pay, the Medicaid lien for medical services provided to E.K. *See, e.g.,* Mich. Com. Laws § 600.6303(4).

In terms of noneconomic damages, medical malpractice actions in Michigan impose a statutory cap. Mich. Comp. Laws § 600.1483(1). The statute defines "noneconomic loss" as "damages or loss due to pain, suffering, inconvenience, physical impairment, or physical disfigurement, loss of society and companionship, . . . loss of consortium, or other noneconomic loss." *Id.* § 600.1483(3). During closing, the government acknowledged that it is not disputing the non-economic damage cap should be awarded. (ECF No. 105, PageID.7632–7633.)

In sum, the Court finds that Plaintiffs have incurred the following damages:

| Expense | Amount |
|---|---|
| Past Medical Damages (AmeriHealth Caritas Lien) | $253,844.15 |
| Out of Pocket Expenses | $830.75 |
| Non-Economic Damages | $1,065,000.00 |
| Future Medical Costs Reduced to Present Value | TBD by Supplemental Briefing |
| **Total Damages** | TBD Pending Supplemental Briefing in Accordance with this Order |

The Court further finds that the Federal Tort Claims Act expressly authorizes attorneys' fees in the amount of 25% of the judgment rendered in this case. 28 U.S.C. § 2678. The Court finds that amount reasonable here.

Plaintiffs, though, are not entitled to pre-judgment interest or punitive damages. 28 U.S.C. § 2674. But post-judgment interest shall compound against the judgment. 31 U.S.C. § 1304(b)(1).

Thus, the Court hereby awards damages to Plaintiffs as set forth in this opinion. A separate judgment will follow.

Dated: July 21, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE